Richard W. Fields
Edward Han
Martin F. Cunniff
Fields Han Cunniff PLLC
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20007
(832) 382-9816
fields@fhcfirm.com
edhan@fhcfirm.com
martincunniff@fhcfirm.com

Karl Smith ("Butch") Bowers, Jr.
Bowers Law Office
1419 Pendleton St.
Columbia, SC 29201
(803) 753-1099
butch@butchbowers.com

Seneca Jacobs
501 Union St., 4th Floor
Nashville, TN 37219
senecajacobs@gmail.com

Counsel for Plaintiff
The White Mountain Apache Tribe

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE WHITE MOUNTAIN APACHE TRIBE,<br><br>                    Plaintiff,<br><br>v.<br><br>MCKINSEY AND COMPANY, INC., McKinsey Holdings, Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Washington D.C.,<br><br>                    Defendants. | Case No. 3:23-cv-373<br><br>Relates to:<br>Case No. 21-md-02996-CRB (SK)<br><br>IN RE: MCKINSEY & CO., NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION (MDL 2996)<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, THE WHITE MOUNTAIN APACHE TRIBE ("Plaintiff" or "the Tribe"), through its attorneys, brings this civil action for compensatory, punitive, and other damages, and restitution, disgorgement, and any other relief allowed by law against Defendant MCKINSEY AND COMPANY, INC. ("Defendant" or "McKinsey") and McKinsey Holdings, Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Washington D.C. (collectively "Defendant" or "McKinsey" unless otherwise noted).

**INTRODUCTION**

1.     Prescription opioids, which include both name-brand prescription opioids and their generic equivalents, are powerful pain-reducing medications. Even when used properly, these drugs can cause addiction, overdose, and death. When used to treat chronic pain, or when used for non-medical purposes, those risks are amplified. In recent years, opioid use for both chronic pain and non-medical purposes has grown dramatically resulting in an epidemic of abuse. Nationwide, millions of Americans are addicted to prescription opioids, and tens of thousands die annually from opioid overdoses.

2.     McKinsey played an integral role in creating and deepening the opioid crisis, engineering aggressive marketing campaigns for the largest opioid manufacturers, distributors, and retailers; organizing industry resistance to regulation while simultaneously advising the U.S. Food and Drug Administration ("FDA") on opioid- related rulemaking; and profiting off its investments in every business category that made money from the misery and death caused by the opioids epidemic. McKinsey's clients accounted for roughly 90% of all opioid pills sold in the United States from 2006 to 2014.

3.     The consultants at McKinsey are some of the best and brightest in corporate America. McKinsey used these talents to become the ringleader of the opioid crisis—a public health crisis that flooded U.S. communities with dangerous drugs, triggering an avalanche of addiction, injury, and overdose deaths, as well as hundreds of billions of dollars in damage.

4.     McKinsey advised companies at every link in the opioid "value" chain, including their manufacture, their distribution throughout the United States and, finally, their sale to consumers. But McKinsey's influence went still further. McKinsey, on its own account and through

affiliations to private equity funds, made major investments in all aspects of the opioid trade, from drug manufacturers to addiction treatment facilities. In sum, McKinsey designed and implemented aggressive marketing strategies, helped dilute and delay effective governmental regulation, and reaped billions of dollars from the human misery it helped create.

## I.    PARTIES

### A.  PLAINTIFF

5.    The White Mountain Apache Tribe is a federally recognized sovereign Indian tribe that maintains a government-to-government relationship with the United States and whose governing body is recognized by the Secretary of the Interior.  *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 86 Fed. Reg. 7554, 7557 (Jan. 29, 2021).

6.    The Tribe has 16,000 Tribal members living worldwide.  The Tribe exercises sovereign powers of self-governance and jurisdiction over its Reservation, which consists of 1.67 million acres (over 2,600 square miles) in east-central Arizona.

7.    The Tribe's principal business address is 201 E. Walnut Street, Whiteriver, Arizona 85941.

8.    The Tribe is governed by its own Constitution, laws, and governmental institutions, including a duly elected Tribal Council.  The Tribal Council is responsible for setting policy and making decisions on behalf of the Tribe and its members.  The Tribal Council oversees the operation of the Tribe's Tribal government and assures quality programs and services are made available to its Tribal members.

9.    The Tribe provides its members with a wide range of government services and programs, including public safety and police services; education; a fire department; a tribal court; a health clinic and various treatment programs; community and family services, including vocational rehabilitation, disabilities services, a domestic violence/sexual assault shelter, and family- centered advocacy; various social services, including adult and child protective services, child support enforcement services, foster care and adoption, Indian child welfare services, a group home, and preventative services; economic development; planning and infrastructure; and other programs and

services.

//

10.    The Tribe also provides governmental services to American Indians and to other eligible individuals in the State of Arizona, pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §§ 5301-5399.  The ISDEAA authorizes Indian tribes and tribal organizations to enter contracts and compacts to assume responsibility to provide programs and services that the federal government would otherwise be obligated to provide for the benefit of American Indians and Alaska Natives.

11.    The Tribe's sovereignty predates the United States Constitution and is recognized and protected under federal law to the extent not expressly limited by treaty or Act of Congress. *See United States v. Wheeler*, 435 U.S. 313, 323 (1978). As a sovereign government, the Tribe and its designated entities carry out governmental functions on behalf of, and for the benefit of, its citizens and other residents of the Tribe's community.

12.    Based on treaties and its unique historical relationship with Indian Tribes, the United States federal government recognizes a responsibility "to provide all resources necessary" to ensure "the highest possible health status for Indians and urban Indians," 25 U.S.C. § 1602(a), and a policy to advance Tribal self-determination pursuant to the statutory framework set forth under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301–5423.

13.    The ISDEAA allows Tribes to take control over federal programs for Indians by contracting or compacting with the federal government to carry out those programs directly. Thus, through self-determination contracts and self-governance compacts under the ISDEAA, Tribal governments, as well as Tribal organizations designated by Tribal governments to act on their behalf, carry out a broad range of governmental services for American Indians and Alaska Natives that were previously administered by the Indian Health Service ("IHS") and other federal agencies. These include, among others, healthcare, law enforcement, Tribal courts, education, social services, natural resources management, and child welfare programs.

14.    The modern Indian healthcare delivery system thus marries the federal government's obligation to provide "federal health services to maintain and improve the health of Indians," 25

U.S.C. § 1601(a), with the Tribes' inherent rights to administer such services and programs in ways that best meet the needs of their communities. It includes programs and services operated directly by IHS; programs and services operated by Tribes and Tribal health programs under ISDEAA contracts and compacts; Urban Indian Health Programs operated by Indian health organizations and funded through the Indian Health Care Improvement Act; and, in Alaska, programs and services operated by intertribal consortia and Tribal organizations pursuant to the Alaska Tribal Health Compact—the umbrella agreement between Alaska Native Tribes, Tribal organizations in Alaska, and IHS, entered into pursuant to Title V of the ISDEAA.

15.    The Tribe, therefore, has the sovereign duty to vindicate the interests of its citizens and community against the callous actions of companies like McKinsey that facilitated the marketing of fatally addictive prescription opioids. In the exercise of its authority as a sovereign government, it brings this action in its proprietary capacity and under its *parens patriae* authority in the public interest, to protect the health, safety, and welfare of its citizens and to stop the prescription opioid epidemic within its community.

16.    On February 4, 2021, forty-nine state attorneys general announced a multistate settlement with McKinsey related to its work for opioid manufacturers. McKinsey agreed to pay almost $600 million dollars. The Tribe was not a party to this settlement, nor did it participate in the negotiations that led to it. Therefore, as a separate sovereign, the Tribe is not impacted by McKinsey's settlement with the States.

**B.  DEFENDANTS**

17.    Defendant "McKinsey and Company, Inc." is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

18.    Defendant "McKinsey Holdings, Inc." is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

19.    Defendant "McKinsey & Company, Inc. United States" is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

20.    Defendant "McKinsey & Company, Inc. Washington D.C." is a Delaware corporation

1    with its principal place of business is located at 711 Third Avenue, New York, NY 10017.

2    //

3    21.    Upon information and belief, McKinsey & Company, Inc. is the parent company of

4    McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey &

5    Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information

6    and belief, each subsidiary corporation is wholly owned by its parent. Despite the corporate form,

7    McKinsey began as a partnership and still refers to its senior employees as "partners." Those

8    partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as

9    "McKinsey."

10    22.    McKinsey is one of the world's largest consulting companies. Its partners work

11    worldwide for corporations and governments across diverse industries, including Purdue and other

12    opioids manufacturers.

13    ## II.    JURISDICTION AND VENUE

14    23.    This Court has jurisdiction over McKinsey because McKinsey conducts business in

15    and throughout Arizona and it has deliberately engaged in significant acts and omissions that have

16    injured the White Mountain Apache Tribe and its citizens. The Tribe's claims arise out of those

17    activities.

18    24.    In addition, this Court has personal jurisdiction over McKinsey through the actions of

19    its co-conspirators in furtherance of the conspiracy, each of which has substantial contacts and

20    business dealings throughout the Tribe and Arizona by virtue of their marketing, sales,

21    manufacturing, and distribution of prescription opioids within the White Mountain Apache Tribe

22    territorial and political jurisdiction.

23    25.    Venue is appropriate for centralized and consolidated pretrial proceedings in this

24    Court under *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, MDL

25    No. 2996, 2021 WL 2351628 (J.P.M.L. June 7, 2021) ("McKinsey MDL").

26    26.    The Tribe is directly filing its complaint into the McKinsey MDL pursuant to the

27    Court's case management order. If it was not filing directly, the Tribe would have filed its complaint

28    in the District of Arizona.

### III.    FACTUAL BACKGROUND

#### A.    THE OPIOID CRISIS

27.    The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

28.    The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western medicine was a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

29.    In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911: "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows… it has become one of the most fertile causes of unhappiness and sin in the United States."

30.    Pharmaceutical companies have long tried to develop substitutes for opium and morphine that would provide the same analgesic effects without the addictive properties. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the United States was limited to prescription only in 1914 and then banned altogether a decade later.

//

31.    Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

32.    Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the Drug Enforcement Administration since 1970.

33.    Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

34.    In contrast, OxyContin, the product whose launch in 1996 ushered in the modern opioid epidemic, is pure oxycodone. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that.

35.    The effects of opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, twelve hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately four to six hours. Still other short-term opioids, such as Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer. The opioid manufacturers promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

36.    Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the

"high." However, opioids depress respiration and, at very high doses, can, and often do, arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

37.     Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

38.     As one doctor put it, the widespread long-term use of opioids "was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

39.     The results were devastating, and the nation continues to reach ever grimmer milestones. In 2020, drug-overdose deaths in the United States soared nearly 30%, reaching all-time highs.

40.     OxyContin, manufactured by Purdue Pharma L.P., was introduced to the market in 1996. Within six years of its introduction, the increasingly widespread misuse and abuse of OxyContin and similar opioids had drawn the attention of the United States Senate.

41.     Two decades ago, Dr. Art Van Zee traveled from the rural coal town of St. Charles, in the southwestern corner of Virginia, to Washington D.C. to provide testimony to the United States Senate Committee on Health, Education, Labor and Pensions. On February 12, 2002, that Committee held a hearing entitled "Examining the Effects of the Painkiller OxyContin, Focusing on Federal, State, and Local Efforts to Decrease Abuse and Misuse of this Product While Assuring Availability for Patients Who Suffer Daily from Chronic Moderate to Severe Pain."

42.     Today, OxyContin—and the methods used to sell it—is widely seen as a principal taproot of the opioid crisis. In those early days of the unfolding opioid epidemic, Dr. Van Zee's medical practice in St. Charles put him in a position to offer informed, first-hand observations of the toll that the pharmaceutical industry's efforts to market opioids was exacting from his community. He testified:

> In the 25 years I have practiced as a general internist in St. Charles, which is a small Appalachian coal mining town, there has never been anything to compare to the epidemic of drug abuse and addiction that we have seen the last 3 years with OxyContin. Contrary to what is sometimes portrayed in the media as long-term addicts switching to the drug du jour, what we have seen for the most part is numerous young people recreationally using OxyContin and then becoming very rapidly addicted. Many of these kids are good kids, good families with bright, promising futures that are being destroyed in every way by their opioid addiction.

43. Further, Dr. Van Zee identified the sales and marketing practices of the pharmaceutical industry when selling controlled substances as a primary cause of the problem:

> My own personal view of the complicated OxyContin abuse problem is that there are at least three major elements involved. First, there has been an obvious problem with physician misprescribing and overprescribing of this drug. Second, this epidemic has been a vicious indicator of the alarming degree of prescription drug abuse in our society. Third and perhaps the one closest to this committee and the FDA is that the promotion and marketing of OxyContin by Purdue Pharma has played a major role in this problem.

44. Five years after Dr. Van Zee's testimony and eighty miles from his hometown of St. Charles, United States Attorney John Brownlee announced in Abingdon, Virginia, the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the misbranding of OxyContin. Brownlee stated, "Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market."

45. Two years later, in 2009, Dr. Van Zee published The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy in the American Journal of Public Health.

46. In his paper, Dr. Van Zee stated the matter plainly: "Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed." In one sense, Dr. Van Zee's observation is not particularly novel. Indeed, it approaches tautology: controlled substances are controlled precisely

because they should not be sold to maximize volume and profits. This did not prevent McKinsey and Purdue from marketing Purdue's opioids full hilt, however. By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."

47.     Dr. Van Zee identified the three principal marketing tactics Purdue employed as a source of OxyContin misuse and abuse—the exact tactics McKinsey identified and promoted— and suggested that regulation may be appropriate to curtail its use. The first was the use of granular sales and marketing data to profile individual prescribers and identify those that already prescribe large amounts of opioids. "Through these profiles, a drug company can identify the highest and lowest prescribers of particular drugs on a single zip code, county, state, or the entire country. One of the critical foundations of Purdue's marketing plan for OxyContin was to target the physicians who were the highest prescribers for opioids across the country."

48.     The second tactic was the use of incentive compensation structures to encourage the salesforce to sell ever more prescriptions of OxyContin. Bonuses at Purdue were "uncapped," meaning there was no upper limit to what an OxyContin salesperson could earn. Rather, salesforce remuneration was a direct function of overall OxyContin sales—the more you sell, the more you make. "A lucrative bonus system encouraged sales representatives to increase sales of OxyContin in their territories, resulting in large numbers of visits to physicians with high rates of opioid prescriptions, as well as a multifaceted information campaign aimed at them."

49.     The third tactic was to increase the overall number of individual calls that the salesforce placed to prescribers. "From 1996 to 2000, Purdue increased its internal sales force from 318 sales representatives to 671, and its total physician call list from approximately 33,400 to 44,500 to approximately 70,500 to 94,000 physicians."

50.     When combined, these tactics produced the intended result. "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."

51.     Dr. Van Zee's observations regarding the direct link between OxyContin marketing and overall opioid overdose mortality would, in time, be confirmed by further academic work,

including empirical research published by the National Bureau of Economic Research in 2019.

52.    McKinsey played a central role in the sales and marketing of these Schedule II controlled substances in the United States for many years. Throughout that time, the purpose of McKinsey's actions was singular: making the most money possible no matter the resultant cost to society. Indeed, no significant concern was given to the fact that greater availability of drugs correlates to opioid-related deaths, addiction, abuse, and misuse. Return on investment was McKinsey's guiding light. McKinsey partnered with numerous opioid manufacturers and other opioid industry participants to maximize the return on investment in sales and marketing efforts for numerous opioid products and did so contemporaneously. Even though the Schedule II controlled substances were designed for a small, narrowly defined group—patients with acute, terminal, or cancer-related pain—McKinsey's goal, in all instances, was to sell as many pills as conceivably possible.

53.    McKinsey is a global consulting firm with many areas of expertise, including the pharmaceutical industry. As a management consulting firm, McKinsey provides plans to managers, directors, and owners on how to run their companies or other enterprises and helps implement those plans.

54.    Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."

55.    Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant provides a plan to the client that the client may choose to adopt or not.

56.    "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and

execute on the plan.

57.     In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work:

> The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job.

58.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the suite of services that McKinsey provided within the "transformational relationship" it developed with its clients. Indeed, writing in 2013, Harvard Business School Professor Clayton Christensen observed the decline in "pure" strategy work performed by consultants, as the industry sought to diversify its income streams by offering implementation and other services to clients. "For example, at traditional strategy-consulting firms, the share of work that is classic strategy has been steadily decreasing and is now about 20%, down from 60% of 70% some 30 years ago."

59.     When partnering with clients, a core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work." McKinsey recognizes it must have its clients' trust and make confidentiality "paramount," as "[c]ompanies share their most competitive secrets with McKinsey" for McKinsey to do its work.

60.     During the implementation phase, McKinsey essentially bonds with the client. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "In some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we working that cohesively together."

61.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."

62.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once an objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve it.

## B.    MCKINSEY WAS AT THE CENTER OF THE OPIOID CRISIS

63.     McKinsey's role in fueling the opioid epidemic is far more extensive than is generally appreciated, with the firm arguably doing more to boost consumption of the deadly drugs than any other single corporation in the United States. Over the past decades, the firm worked for many of the largest opioid manufacturers, distributors, retailers, and investors. During the same period, it also performed several projects for the very division at the FDA responsible for overseeing opioid sales. The FDA's lax regulation was favorable to drugmakers in several key respects.

### 1.    McKinsey Worked for All of the Major Opioid Manufacturers

64.     Today, McKinsey's website explains "How We Help Clients" in the pharmaceuticals industry: "Helping clients maximize commercial value by assisting with product launch, marketing, sales, and market access." McKinsey helps numerous clients throughout the pharmaceutical industry, from manufacturers to distributors and pharmacies. It often does so contemporaneously. For instance, McKinsey might advise multiple opioid manufacturers on the sales and marketing of competing branded opioid products.

65.     McKinsey's dominance of the consulting space in the pharmaceutical industry presents its own opportunity for further client service. Specifically, McKinsey also helps its clients by telling them what their competitors—who are also McKinsey clients—are doing.

66.     For example, McKinsey pitched its services to Purdue on the basis that it was able to "bring examples from other successful companies" and perform "detailed analytics."

67.     Like most management consulting companies, McKinsey organizes itself into

practice groups that specialize in a given industry.

68.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2004, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson worked for McKinsey for twenty-three years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.

69.    Pearson stated: "At McKinsey pharmaceuticals was one of our biggest industry groups." Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"

70.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

71.    In 2012, while advising Purdue, McKinsey described PMP and its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

72.    That same year, the PMP group published a report entitled "Death of a Sales Model, or Not: Perspectives on the Evolution of Pharmaceutical Field Based Selling." In it, McKinsey partner Laura Moran co-authored a segment called "The Few, The Proud, The Super-Productive: How a 'smart field force' can better drive sales." In the segment, Moran and her co-authors described various ways a pharmaceutical company could optimize its sales force. Moran worked on

the Purdue account, where the strategies outlined in her article were incorporated into Project Turbocharge two years later.

73.     With respect to pharmaceutical marketing, the PMP group states, "We support clients in creating high-impact strategies that maximize value, using customized tools. We also have detailed market data for all major geographic regions." PMP also works with pharma clients regarding their sales force: "Our efforts span the entire organization—we can help train and restructure sales forces, work directly in the field to provide coaching, maximize value from back-office services, develop strategies to accelerate short-term sales, and assist with company-wide commercial transformations."

74.     McKinsey has long considered itself a "leadership factory" for good reason. Nowhere is this more apparent than the pharmaceutical industry, where, thanks to PMP's efforts under Pearson's leadership, McKinsey continues to reign as the dominant management consultant.

75.     Consistent with PMP's ambition that McKinsey be the dominant consultant in the pharmaceutical industry, McKinsey has blanketed the entire pharmaceutical supply chain with alumni.

76.     Rajiv de Silva, for instance, was appointed CEO of Endo Pharmaceutical in March 2013. Endo's two top-selling drugs were pain medications. Endo—and de Silva, individually— have been named in multiple lawsuits related to the ongoing opioid crisis. Previously, de Silva worked with Pearson in a leadership position within PMP at McKinsey before joining Rob Rosiello, a former McKinsey partner, and Pearson at Valeant. McKinsey advised Endo on its opioid business.

77.     Likewise, Frank Scholz was a partner at McKinsey and a leader in the PMP group for seventeen years prior to departing in 2013 to join Mallinckrodt, another opioid manufacturer presently in bankruptcy after being named in numerous lawsuits relating to the ongoing opioid crisis. In fact, Scholz was the President of the "Specialty Generics" division of Mallinckrodt (formerly SpecGX LLC), which is the division that sold generic opioids. McKinsey advised Mallinckrodt on its opioid business.

//

78.     Teva Pharmaceuticals, another opioid manufacturer named in numerous lawsuits for

its role in the opioid crisis, is led by President and Chief Executive Officer and McKinsey alumnus, Kare Schultz. He joined the company in 2017, at which point he was also appointed to Teva's board of directors. Through an asset manager named Deerfield, McKinsey's in-house hedge fund held a financial stake in Teva Pharmaceuticals while McKinsey advised its numerous clients on how to maximize opioid sales.

79.    McKinsey's involvement with Teva has been long-term. In 2006, upon his retirement from McKinsey, Roger Abravanel joined Teva's board of directors the following year. By 2011, Teva had acquired Cephalon, Inc., another manufacturer of opioids, as "a core part of [Teva's] strategy" of "growth through acquisitions." Befitting the pattern, Cephalon had its own long-standing ties to McKinsey before being acquired by Teva. In 2008, when Cephalon's Executive Vice President, General Counsel, and Secretary John E. Osborn retired, he accepted a job as "an advisor on life sciences regulatory and compliance matters to the international consulting firm McKinsey & Company, Inc."

80.    McKinsey has ties to another notable opioid industry combination: the 2012 acquisition of Actavis, Inc.by Watson Pharmaceuticals, Inc. ("Watson") for €4.25 billion. In the aftermath of the acquisition of the large European pharmaceutical company, Watson created a "Global Integration Management Office" reporting directly to its CEO, Paul Bisaro, to focus "on planning and implementing the integration of Actavis." In order to achieve this critical task, Watson hired Marc Lehnen: "We were very pleased to recruit Marc from McKinsey & Company, Inc. to lead the Integration Management Office. Marc has years of experience in the generic industry and knows our culture and way of operating." Notably, the press release indicates that McKinsey was already advising Watson regarding the acquisition: "Although Marc does not formally join our Company until July, he will nevertheless be involved in the integration planning during this interim period."

81.    Allergan, another opioid manufacturer and defendant in the nationwide opioid litigation, has also relied on McKinsey as a source of management candidates. McKinsey Senior Adviser Christopher J. Coughlin joined Allergan's board in 2014 and remains there today.

//

82.    Abbott Labs, which partnered with Purdue in the early years of OxyContin to use

Abbott's sales force to market Purdue's drug, has been led by CEO Miles White since 1998. White began his career at McKinsey around 1980.

83.    As the preceding paragraphs make clear, McKinsey was in a truly unique position given its dominance of pharmaceutical management consulting through PMP, practically all opioid industry participants were its clients. And those same clients routinely hire McKinsey consultants to leadership positions within their companies. While advising multiple industry participants regarding the sales of competing products, McKinsey was in a position to know confidential information and trade secrets of these clients "with the understanding that confidentiality is paramount."

84.    Because of its client relationships, McKinsey was, quite literally, the sole repository on Earth of this collective knowledge of industry-wide tactics regarding the sales and marketing of opioids, and the outcomes thereof. This unique collection of knowledge and expertise made McKinsey a hub: even if any two given industry participants did not know what each other was doing, McKinsey knew exactly what both were doing because both were clients.

85.    McKinsey has numerous clients that manufacture opioids. It has done extensive work for Purdue Pharma and Johnson & Johnson. It has also worked for EndoInternational, Mallinckrodt, Teva, Actavis and Abbott Labs. These manufacturers constituted most of the market. The federal Drug Enforcement Administration ("DEA") has published data indicating that just four of McKinsey's clients—Purdue, Endo/Par, Mallinckrodt, and Actavis—accounted for nearly 90% of all opioid pills sold in the United States from 2006 to 2014.

### a)    McKinsey and Purdue Pharma

86.    McKinsey's work with Purdue Pharma, which was extensive and is well-documented, is discussed in detail below.

87.    Purdue Pharma L.P. is a limited partnership incorporated in the state of Delaware with its principal place of business in Stamford, Connecticut. Purdue Pharma Inc. is a New York corporation with its principal place of business in Stamford, Connecticut; the Purdue Frederick Company Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut; and Purdue Pharma Manufacturing Inc. is a New York corporation with  its principal place of business in Stamford, Connecticut (collectively, "Purdue").

88.    At all relevant times, Purdue has manufactured, marketed, distributed, and sold and continues to manufacture, market, distribute, and sell prescription opioids, including OxyContin, MS Cantin, Dilaudid, Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER to distributors, pharmacies, and physicians with locations in the White Mountain Apache Tribe.

### b)    McKinsey and Mallinckrodt

89.    Mallinckrodt was one of McKinsey's leading clients in the opioid industry. The firm worked for the Irish American drugmaker during much of the 2010s.

90.    Mallinckrodt primarily sells generic drugs, including oxycodone and hydrocodone, two of the most popular opioids on the market. Mallinckrodt's U.S. headquarters are in St. Louis, and it markets opioids through a subsidiary called SpecGxLLC.

91.    Mallinckrodt is far less known than Purdue Pharma but, at times, it has played an even more significant role in fueling the opioid crisis. For example, between 2006 and 2014, Mallinckrodt produced more opioid pills than any other manufacturer operating in the United States, according to an analysis of DEA records by the Washington Post. The 36 billion pills manufactured by Mallinckrodt during that period accounted for 35.7% of the total market. The DEA described Mallinckrodt as the "kingpin of the drug cartel."

92.    Several jurisdictions whose residents have suffered from the opioid epidemic have filed lawsuits against Mallinckrodt. Several opioid-related lawsuits against the drugmaker are ongoing.

93.    During much of the period that Mallinckrodt was producing billions of opioid pills, McKinsey worked with the drugmaker. Accounting records submitted in connection with opioid litigation show that Mallinckrodt made more than 70 payments, worth more than $30 million, to McKinsey from 2013 to 2017. In 2000, 2001, and 2008, Mallinckrodt made at least five additional payments to McKinsey with a total of $3 million. Most of those payments went to McKinsey's office in Philadelphia and several others were sent to the firm's Dusseldorf, Germany, offices.

94.    There is some evidence that McKinsey's consulting work for Mallinckrodt concerned sales of its opioid products. Documents related to McKinsey's February 2021 settlement with state attorneys general indicate that the firm helped Mallinckrodt on its opioid sales. In addition, the

1  timing of the payments included in the accounting records covers the same period in which

2  McKinsey increased its work for clients in the sector.

3      95.    There are additional indications of the years-long relationship between Mallinckrodt

4  and McKinsey. The drugmaker began as a subsidiary of Tyco International, a conglomerate where

5  several former McKinsey employees held to positions. In 2006, McKinsey led a reorganization in

6  which Mallinckrodt and other pharma companies held by Tyco were spun off into a company

7  named Covidien.

8      96.    Covidien said in 2011 that it would take Mallinckrodt public, a process that was

9  completed with the drugmaker's IPO in 2013. At least four executives from Tyco and Covidien

10  became special advisers to McKinsey's M&A and pharmaceutical teams around the time of the IPO.

11                          **c)    McKinsey and Actavis**

12      97.    The McKinsey clients that produced opioids included Actavis Generics, a specialist in

13  off-brand medicines that manufactured oxycodone and hydrocodone. The New Jersey-based

14  company produced more than 32 billion pills from 2006 to 2014, accounting for 32% of the total

15  national market, according to DEA records. Actavis dramatically increased its opioid production

16  during that period: its output of oxycodone doubled, and its production of hydrocodone increased by

17  50%.

18      98.    Actavis PLC is a public limited company incorporated in Ireland with a principal

19  place of business in Dublin, Ireland. Watson Laboratories, Inc., which is a Nevada corporation with

20  its principal place of business in Corona, California, is a wholly owned subsidiary of Allergan

21  PLC(f/k/a Actavis, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals,

22  Inc.) is a Delaware corporation with its principal place of business in New Jersey. Actavis LLC is a

23  Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

24      99.    Allergan PLC's corporate history involves several different parent and subsidiary

25  companies operating under different names. Watson Pharmaceuticals acquired Actavis, Inc. in

26  October 2012; that combined company changed its name to Actavis, Inc.in January 2013, then to

27  Actavis PLC in October 2013. Actavis PLC acquired Allergan PLC in March 2015; that combined

28  company then changed its name to Allergan PLC.

100.     Each entity in that line of succession is a defendant that Allergan PLC owns and uses to market and sell its drugs in the United States. Allergan PLC exercises control over those marketing and sales efforts. Profits from the sale of Allergan and Actavis product simultaneously flow to Allergan PLC. (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are collectively referred to herein as "Actavis.")

101.     Actavis markets and sells opioids throughout the United States and within the Tribe. Its most sold branded product is Kadian. Kadian is a Schedule II opioid that contains extended-release morphine sulfate, first approved in 1996 for patients hoping to manage severe pain. Actavis acquired the rights to Kadian in 2008 from King Pharmaceuticals, Inc. and began marketing Kadian in 2009. Actavis also markets and sells Norco (generic Kadian), as well as generic versions of Duragesic and Opana.

102.     As described above, several different parent companies have owned Actavis over the past two decades. The company's production of opioids has exposed those parent companies to increased legal liability.

103.     Allergan, which merged with Actavis in 2014, has been targeted by opioid litigation from several states and municipalities. That legal exposure has prompted speculation that Allergan could dissolve, rather than pay the penalties that may result from that litigation. Teva Pharmaceuticals, which is discussed in greater detail below, acquired Actavis in 2016. Teva has also been the target of a multitude of lawsuits. Ownership of Actavis has added to the legal jeopardy faced by both Allergan and Teva.

104.     In the early 2010s, McKinsey worked on a significant Actavis merger, helping the company increase its share of the generic drug market. Actavis was acquired by Watson Laboratories Inc., another manufacturer of generic drugs, in 2012. Media reports and corporate documents indicate that McKinsey helped Watson negotiate the deal. The firm also helped to oversee Watson's integration with Actavis. Watson hired a McKinsey consultant named Marc Lehnen to manage the integration shortly after the sale. Lehnen reported directly to the chairman of the board. The merged company retained the name Actavis after the transaction was completed.

105.    There are many overlaps in personnel that indicate McKinsey's relationship with Actavis. In 2010, a partner in McKinsey's pharmaceutical practice named Emico Vanni became an Actavis director. Chris Coughlin, a former Tyco CFO who became an Actavis board member in 2014, also worked for McKinsey as an advisor.

106.    Over the same period, Actavis worked with Valeant Pharmaceutical on several drugs. McKinsey played a significant role in guiding Valeant's corporate strategy during this period.

### d)    McKinsey and Teva/Cephalon

107.    McKinsey's involvement in the opioid industry includes its work for Teva Pharmaceuticals, which is the largest manufacturer of generic drugs in the world.

108.    Teva's involvement in the U.S. opioid market stretches back to at least 2004, when its generic version of OxyContin was approved by regulators. Teva provided just under 1% of the opioid pills that were manufactured in the United States from 2006 to 2014. Teva's market share increased significantly following two major acquisitions: its 2011 purchase of Cephalon, the manufacturer of a lollipop containing fentanyl, and its purchase of Actavis, the second-largest U.S. producer of opioids, in 2016.

109.    Teva USA and Cephalon, Inc. work closely with one another to market and sell Cephalon, Inc. products in the United States. Since the acquisition of Cephalon, Inc. by Teva Ltd. in October 2011, Teva USA has conducted all sales and marketing activities of Teva Ltd. for Cephalon, Inc. in the United States. Teva USA holds out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon, Inc. branded products through its "specialty medicines" division. Teva Ltd.'s financial reports list Cephalon, Inc.'s and Teva USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon, Inc. acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Through such interrelated operations, Teva Ltd. operates in Arizona and the rest of the United States through its subsidiaries Cephalon, Inc. and Teva USA.

110.    The FDA-approved prescribing information and medication guide—which is distributed with Cephalon, Inc. opioids that are marketed and sold in Arizona, including in the Tribe's service area. ("TJSA")—discloses that the guide was submitted by Teva USA, and directs

physicians to contact Teva USA to report adverse events.

111.    Cephalon manufactures, promotes, sells, and distributes opioids, including generic versions of OxyContin as well as Fentora and Actiq—both Schedule II opioids indicated for the management of breakthrough pain in cancer patients-in the United States and in the TJSA. Fentora is a fentanyl tablet that is placed inside an individual's mouth in a manner similar to chewing tobacco and then allowed to dissolve. Actiq is a fentanyl citrate lozenge similar to a lollipop. Actiq was granted restricted marketing approval by the FDA in 1998 and was to be promoted only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

112.    Teva has been the target of a multitude of opioid-related lawsuits. McKinsey worked for Teva in 2012. The drugmaker hired the firm to oversee a management reform known as Project Spring. Industry reports indicate that the reforms taken as part of Project Spring included a greater focus on routine corporate acquisitions. McKinsey's pharmaceutical practice has frequently advocated for such regular acquisitions.

113.    McKinsey continued to work for Teva after Project Spring was completed. In 2016, a Teva manager corresponded by email with McKinsey consultants about the drugmaker's Medicare payment programs. Those exchanges were included in documents released by the U.S. Attorney's office in Massachusetts, which was investigating Teva for fraud. McKinsey does not appear to have been a target of the Massachusetts investigation, but the correspondence suggests that the firm consulted with Teva about ways to ensure that patients could use Medicare to obtain drugs that it manufactured.

114.    Kare Schultz, who became Teva's CEO in 2017, spent the early part of his career at McKinsey. Schultz has also held leadership roles at several other drug companies that hired McKinsey. Several other McKinsey alumni also serve in key positions at Teva. For example, after a long career at McKinsey, Roger Abravanel joined the Teva board in 2007, remaining in that position for a decade.

//

e)    **McKinsey and Endo International/Par Pharmaceutical**

115.     Another McKinsey client that played a central role in the opioid crisis is Endo International.  Endo International PLC has two principal places of business: one in Dublin, Ireland and the other in Malvern, Pennsylvania.

116.     Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals, Inc. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

117.     Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly owned subsidiary of Par Pharmaceuticals Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal  place  of business  in Chestnut  Ridge, New  York. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies,  Inc. (collectively  "Par Pharmaceutical") were acquired by Endo International  P L C  in September 2015 and serve as the operating companies of Endo International PLC. (Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Endo International  P L C , and Par Pharmaceutical are collectively referred herein to as "Endo.")

118.     The opioids manufactured by Endo include Percocet and Opana, as well as oxycodone and morphine.  Endo's  purchase  of Par  Pharmaceutical, one of the largest makers of generic opioids, in 2015 gave it a significant role in opioid epidemic.  Par made 18 billion opioid pills from 2006 through 2014, accounting for 17.6% of the total market. Only Mallinckrodt and Actavis produced more pills during that period.

119.     Endo's best-selling opioid for many years was Opana ER, an extended-release painkiller. Following reports that drug users were crushing Opana ER and then snorting or injecting it, in order to get the full effect all at once, rather than over time, Endo released a reformulated version in 2012. While the new version was intended to make such abuse more difficult, some users continued to crush the Endo pills and inject the opioid powder, leading to outbreaks of diseases such as HIV and hepatitis C among people who had shared needles. In 2017, the FDA asked Endo to pull Opana ER. The agency said it had never before sought to remove an opioid pain medicine from the

market because of concerns about abuse. Endo withdrew Opana ER and also said it would voluntarily stop promoting its opioid medications and stop research and development on new opioids.

120.    In the $600 million settlement that McKinsey reached with 49 states in February 2021, Endo is listed among McKinsey's opioid clients. McKinsey designed and implemented marketing programs for Endo, "increasing the sale and use of opioids," according to documents filed in the case.

121.    McKinsey veterans have served in the top levels of Endo management. In 2013, the drugmaker tapped a former McKinsey principal named Rajiv De Silva as its new CEO. De Silva had previously been an executive at another pharmaceutical company, Valeant, which often turned to McKinsey for advice on acquisitions. After he joined Endo, De Silva launched a series of acquisitions of his own, apparently relying on a version of the strategy that McKinsey had helped forge at Valeant.

122.    Endo's purchase of DAVA Pharmaceuticals, a generic drug specialist, in 2014 was one of the first deals that De Silva pursued at the drugmaker. Court filings in a securities case show that Endo hired McKinsey to provide "the pre-acquisition valuation of the DAVA acquisition." McKinsey's early work on mergers often evolves into a much more expansive role for the firm, including the provision of strategic advice and help with the integration of the merging companies.

123.    In 2015, Endo acquired Par Pharmaceuticals for $8 billion. Before that deal, Endo had been providing less than one half of 1% of the supply of opioid pills in the country. The acquisition of Par made Endo the third largest opioid producer in the United States. De Silva's use of McKinsey during his 2014 acquisition, as well as the mergers he pursued during his time at Valeant, suggests that he may have again sought assistance from the firm for the Par deal.

124.    Personnel overlaps also suggest that McKinsey may have been involved with Endo's acquisition of Par. At the time of the deal, Par was owned by TPG, a private equity firm with $85 billion in assets. TPG's pharmaceutical and health care team is made up largely of former McKinsey consultants who were closely engaged with Par.

125.    A McKinsey publication in August 2015 noted that TPG had collected a sevenfold

return on the Par sale.  At the conclusion of deal, TPG retained a stake in Endo worth more than $1.5 billion, making the fund the largest shareholder in the drug company.  TPG appears to have held a significant stake in Endo until February 2020.

### f)    McKinsey and Abbott Laboratories

126.    McKinsey has also worked for Abbott Laboratories, which worked with Purdue Pharma in the late 1990s, as Purdue sought to expand its opioid sales.

127.    The FDA approved Purdue's OxyContin painkiller in 1995. The following year, the drugmaker hired Abbott.  At the time, Abbott, based outside Chicago, was larger than Purdue. Tapping Abbott to help sell its opioid to doctors, hospitals, and others helped Purdue expand its reach across the count1y.

128.    Under their joint sales promotion program, Abbott provided 300 sales representatives a year to promote  OxyContin. The additional  salespeople  doubled Purdue's sales team in the initial years of the partnership, which remained in place for seven years.  The program is similar in  many respects to the advice that McKinsey  would give Purdue a decade later about how to "turbocharge" sales of its opioid painkillers. With Abbott's help, Purdue increased sales of OxyContin from $49 million in 1996 to $1.6 billion in 2002. Over the same period, the country suffered its first wave of overdose deaths attributed to opioids.  Public health officials have attributed the mounting deaths to the increased use of prescription opioids such as OxyContin.

129.    Abbott used aggressive tactics to market OxyContin. Internal company documents obtained by Stat show that "the sales team referred to the marketing of the drug as a 'crusade,' and their boss called himself the 'King of Pain.'" Top salespeople were awarded prizes of $20,000.

130.    Under the terms of their  partnership,  Purdue paid  Abbott  nearly $500 million. Abbott noted in its 2003 annual report that it was facing 306 lawsuits related to its OxyContin work. To date, the company appears to have avoided significant legal exposure for its early opioid work because Purdue indemnified Abbott as part of the arrangement.

131.    Miles D. White, a former McKinsey partner, took over as CEO of Abbott in 1999. Abbott announced a $6.9 billion acquisition of Knoll, a German drugmaker, in 2000.  The deal was important one for Abbott, leading the company to develop and launch Humira, which is now the top

selling drug in the world.

132.    White engaged McKinsey for help with the Knoll deal. Court documents show that Abbott hired the firm in late 2000 or early 2001 to manage the integration with Knoll. This timeline means McKinsey was working with Abbott during the period that the drug company was using aggressive sales tactics to increase sales of OxyContin.

133.    Additional evidence demonstrates McKinsey's broad role in providing advice to Abbott and its CEO while Abbott was encouraging doctors to prescribe more OxyContin. The former managing partner of McKinsey's Chicago office, Richard Ashley, became a top executive at Abbott in 2004. While at McKinsey, Ashley "was an adviser to Abbott on various corporate matters, including strategy and governance," an indication that the firm's work included more than its advice on the merger with Knoll.

134.    Taken together, the evidence suggests that McKinsey helped to craft Abbott's strategy at a critical time, as the drug company was working to broaden its position in the opioid sector.

135.    McKinsey and Abbott appear to have continued to work together for several years after the Knoll acquisition. In 2013, McKinsey featured an interview with White, Abbott's CEO, in one of the firm's publications. Such friendly coverage of an executive is often an indication that the firm is working for a company. According to corporate records filed by Mylan, McKinsey advised that company on its acquisition of Abbott's generics arm in 2014. Abbott is also listed among the current clients of McKinsey's design subsidiary, Lunar.

136.    Former McKinsey consultants also occupy key executive positions at Abbott, another indication of the firm's influence with the company. White became Abbott's executive chairman in 2020, when he stepped down as chairman and CEO. In addition to Ashley, several other top Abbott executives previously worked for McKinsey. They include Katherine Doyle, an Abbott board member who joined the company in 2011 from McKinsey, and John Schilling, joined Abbott in 2008 from McKinsey. Schilling managed sales and marketing at Abbott, the same work that Abbott did for McKinsey's client, Purdue.

**g)**    **McKinsey and Johnson & Johnson**

137.    McKinsey also worked for Johnson & Johnson, an American pharmaceutical and medical device company headquartered in New Brunswick, New Jersey, in designing aggressive marketing programs to push opioid sales.

138.    In the early 2000s, McKinsey encouraged Johnson & Johnson to target high-risk populations aggressively. In one presentation from 2002, for instance, the firm advised Johnson & Johnson to "[t]arget high abuse-risk patients (e.g., males under 40)." The film also suggested that Johnson & Johnson reach out to doctors specializing in treating elderly patients with back pain and expanding some of its stronger painkillers beyond use in cancer patients.

### 2.    McKinsey Worked for All of the Major Opioid Distributors

139.    McKinsey also worked for the three major drug distributors: McKesson, AmerisourceBergen, and Cardinal Health.

140.    McKinsey's relationships and influence carry far beyond the manufacturers. For instance, current McKinsey director Nancy Killefer has also been an independent director of Cardinal Health, Inc. ("Cardinal") —one of the "Big Three" Distributor Defendants in the ongoing nationwide opioid litigation—since 2015. Chunhui Moi, Cardinal's current Vice President of Corporate Strategy, was previously an associate principal at McKinsey, where he worked for nine years. Michele Holcomb, Cardinal's current Executive Vice President, Chief Strategy and Business Development Officer, was a partner in the Global Pharmaceutical Practice at McKinsey.

141.    McKinsey populates the "strategy" positions at the other opioid distributors as well. At AmerisourceBergen, the "Director of Corporate Development and Strategy" was hired away from McKinsey, where she had previously been a senior associate. AmerisourceBergen's Executive Vice President and Chief Strategy Officer had previously been a partner at McKinsey.

142.    At McKesson Corporation ("McKesson"), another McKinsey client, the President of McKesson Specialty Health and, previously Vice President of Corporate Strategy, was Marc Owen. "Prior to joining McKesson, Owen was a senior partner at McKinsey, advising pharmaceutical manufacturers, healthcare providers, distributors and technology companies, including McKesson, for more than a decade." After Owen was promoted in 2012, McKesson hired yet another Vice President of Corporate Strategy away from McKinsey.

143.    In short, McKinsey adds value for a client by knowing what all of its competitors are doing. It possesses a greater body of knowledge about any given industry in which it advises multiple participants than any individual participant does itself.

### a)    McKinsey and McKesson

144.    McKinsey's client roster includes McKesson, the largest distributor of opioids in the U.S.  The company, based in Irving, Texas, accounts for one-third of all pharmaceuticals used in North America. McKesson serves more than half of U.S. hospitals and one-fifth of American physicians.

145.    McKesson distributed 19 billion oxycodone and hydrocodone pills between 2006 and 2014, more than any other distributor. The pills provided by McKesson made up 18.9% of the pills shipped in the country during that period. During a December 2017 episode of *60 Minutes,* David Schiller, the DEA assistant special agent in charge of the lead field team for the agency's investigation of McKesson, said the company is "at the forefront" of the opioid epidemic.

146.    McKinsey's relationship with McKesson stretches back to at least 2008. That year, the firm prepared a proprietary report for McKesson about the process of authorizing medication requests with insurance companies, a critical issue for the opioid industry. If McKinsey's report resulted in a streamlined approval process for opioid prescriptions, both McKesson and the broader opioid market would have benefited.

147.    McKinsey appears to have consulted for McKesson on a wide range of matters for at least a decade following the 2008 report.  In 2013, the firm worked with a McKesson unit based in the United Kingdom that provides the National Health Service with IT services. In a 2017 post on an online message board, a person described as a McKesson employee said the company had brought in McKinsey to assist with a reorganization of the general counsel's office. McKesson's principal legal exposure for several years has been its opioid liability.

148.    Several video and print interviews conducted between 2006 and 2012 by McKinsey Quarterly with McKesson's former CEO, John Hammergren, further indicateda close relationship between the firm and the drug distributor. McKinsey has a long pattern of promoting its clients and their executives in the Quarterly and other company publications. The McKinsey interview with

Hammergren suggests that McKesson may have hired the firm as early as 2006, shortly after McKinsey's first known work for Purdue Pharma.

149.    There is additional evidence that McKesson remains an active McKinsey client.  A McKesson executive recently participated in a McKinsey leadership program that appears to be exclusively for employees of companies that have retained the consulting firm.

150.    McKinsey promotes programs such as its Black Executive Leadership Program, part of the "McKinsey Academy," as a service the firm provides to its clients. The Black Executive Leadership Program is an offshoot of the firm's Executive Leadership Program, whose participants "are nominated by their organization's leaders in conjunction with their McKinsey client service team." James Frison, who is both McKesson's senior director for social impact and president of the McKesson Foundation, has been listed as an executive sponsor of McKinsey's Black Executive Leadership Program since December 2020.

151.    Many high-ranking executives have also jumped between McKesson and McKinsey. At least three McKesson employees have left the drug distributer in recent years to join McKinsey. They include Neema Uthappa, who was the global director of automation, AI, and engineering at McKesson from 2017 to 2021.  Uthappa was recently named McKinsey's head of data and analytics engineering.

152.    There have also been significant personnel flows in the opposite direction. The roster of current and former McKesson executives includes at least 11 people who worked at McKinsey earlier in their careers.  This pattern of McKinsey consultants going on to take senior positions at McKesson dates back to the 1970s.

153.    Many of the former McKinsey employees who moved on to McKesson worked as consultants for the distributor before they became full-time employees at the company. One such example is Marc Owen, who was a member of McKesson's executive committee from 2001 to 2017. Prior to joining McKesson, he was a senior partner at McKinsey with a focus and pharma and health care, with McKesson among his clients. Similarly, McKesson Vice President Ramesh Srinivasan joined the distributor in 2013, after seven years at McKinsey. Nathan Gosse, who occupied a post as vice president in McKesson from 2011 to 2020, also joined immediately from

McKinsey, having worked for the consulting firm from 2008 to 2011. Other top McKesson executives who previously worked at McKinsey include  Erin Young, the chief marketing and merchandising officer of McKesson Canada, and Jose Queijo, a senior director of strategy at McKesson since April 2020.

### b)    McKinsey and AmerisourceBergen

154.    McKinsey also performed engagements for AmerisourceBergen, the second largest pharmaceutical distributor in the United States. The distributor, based in Chesterbrook, Pennsylvania, accounted for 13.2% of all oxycodone and hydrocodone pills shipped in the United States from 2006 to 2014, more than 13 billion in all.

155.    AmerisourceBergen appears to have a longstanding professional relationship with McKinsey. In March 2018, for instance, AmerisourceBergen tapped McKinsey to consult on, among other topics, the distributor's outreach to drug manufacturers.

156.    A filing submitted as part of a lawsuit against the big three distributors by Huntington, West Virginia, and surrounding Cabell County, is indicative of McKinsey's work for AmerisourceBergen. The expert witness report refers to a materials AmerisourceBergen provided to McKinsey as part of its engagement, including marketing and promotional literature, price lists for its advertising campaigns, and details of past strategies for targeting patients and providers. Such issues were typical of McKinsey'sconsulting work for companies in the opioid sphere.

157.    Many former McKinsey personnel have decamped for AmerisourceBergen. For instance, Leslie Donato, the distributor's chief strategy officer and executive vice president spent nearly 15 years at McKinsey in the 1990s and 2000s. AmerisourceBergen's chief information officer, Mark Spykerman, joined the distributor in 2012 after a five-year stint at McKinsey. Sara Fernandez, who headed an AmerisourceBergen consulting division from 2008 to 2018, came to the distributor after two years at McKinsey. And Eric McCafferty, AmerisourceBergen's recently named vice president for strategy and corporate development, was a McKinsey consultant from 2001 to 2011.

### c)    McKinsey and Cardinal Health

158.    McKinsey has long worked for Cardinal Health, the third  member  of the big three

distributors. Headquartered in Dublin, Ohio, Cardinal Health operates the "largest generic sourcing entity in the U.S." in partnership with CVS Caremark. According to DEA data, the distributor was responsible for shipping the second largest quantity of oxycodone and hydrocodone in the U.S. from 2006 to 2014-15 billion pills total.

159.    At least one Cardinal Health executive recently completed a McKinsey leadership program that the firm offers exclusively to clients, indicating that Cardinal Health is a client. Stephanie Revish, the distributor's vice president for finance transformation, completed McKinsey's Black Executive Leadership Program in January 2021.

160.    Two additional Cardinal Health vice presidents have also completed the same program: Angela Thomas, a 26-year veteran of the company, and Rick Bright, who joined Cardinal Health in 2018 after six years at AmerisourceBergen.

161.    Cardinal Health has participated in several McKinsey initiatives in which it typically works with client firms. These include a 2018 study of women in corporate American, titled "Women in the Workplace." In 2009, Karry Clark, who then served as chairman and CEO of Cardinal Health, was among 14 interviewees in a McKinsey Quarterly article about their response to the Great Recession. The executives featured in these articles often work for McKinsey clients.

162.    On at least two prior occasions, Cardinal Health executives acknowledged hiring McKinsey. In a 2010 interview, Jeff Henderson, then the distributor's CEO, alluded to the firm's work on strategic issues like cost-cutting and IT: "If we engage Deloitte or McKinsey, we designate a very senior executive as its sponsor, to understand and monitor any and all projects being done by that firm." Four years earlier, former CEO David Schlotterbeck said the company had "been working with McKinsey & Co. on developing large-scale strategies for Cardinal Health on a global basis," in response to a question about the firm's operations in Europe.

163.    As with its big three competitors, Cardinal Health has also hired executives from McKinsey on repeated occasions. Nancy Killefer spent 21 years at McKinsey—and reportedly founded the firm's public-sector practice, which has worked extensively with the FDA—before being named to Cardinal Health's board of directors in 2015. Former McKinsey pharma partner Michele Holcomb has been executive vice president and chief strategy and business development

officer at Cardinal Health since 2017. Other McKinsey alumni who later moved onto Cardinal Health include Rudy Poussot, who served as vice president for corporate strategy at Cardinal Health between 2010 and 2017, and Nicolette Jang Turner, a director and vice president at Cardinal Health from 2016 to 2020.

### 3. McKinsey Worked for Major Retailers Who Sold Opioids

164. McKinsey has performed multiple engagements for two of the largest retail vendors of opioid drugs-CVS and Walmart. The two pharmacy chains have hired McKinsey to deal with a host of different strategic issues, likely including their opioid sales. Other McKinsey clients in the opioid sphere have launched initiatives with CVS and Walmart, a likely sign of McKinsey's coordination.

### a) McKinsey and CVS

165. McKinsey has worked extensively for CVS over the past decade. CVS Pharmacy, Inc. is a Rhode Island business entity with its principal place of business in Rhode Island. CVS Health Corporation (together with CVS Pharmacy, Inc., "CVS") is a Delaware business entity with its principal place of business in Rhode Island.

166. CVS is authorized to conduct business in Arizona. At all relevant times, CVS has sold and continues to sell prescription opioids at locations in Arizona that serve citizens of the Tribe, including near hospitals, clinics, and other health care facilities serving patients of the Tribe's health care system.

167. CVS operates nearly 10,000 retail locations across the country. The chain has been among the country's top sources of opioids, providing 7.7 billion pills, or 7.6% of the market, from 2006 to 2014. The chain ranks second only to Walgreens among pharmacy chains in the provision of opioids.

168. CVS has already been sanctioned for its lax oversight of opioids. The company reached a $22 million settlement with the Department of Justice in May 2015 following charges that the chain and its wholesale supplier, Cardinal Health, knew that large orders of oxycodone were being shipped to two of its Florida locations but did nothing to investigate the suspicious sales.

169. According to its most recent annual report, CVS is a defendant in hundreds of opioid-

related cases, including cases brought by several state attorneys general. CVS also said that, in January 2020, it was served with an administrative subpoena seeking "documents relating to practices with respect to opioids."

170.    CVS is reportedly among McKinsey's biggest clients.  CVS  is listed among the users of Periscope, a platform built by McKinsey that provides retailers with data and analytics tools. CVS is also mentioned regularly in McKinsey publications, which often indicates an ongoing client relationship.

171.    There are several indications that a McKinsey managing partner named Rodney Zemmel was among the firm's executives who worked with CVS. Zemmel co-authored a 2018 book, Go Long: Why Long-Term Thinking is Your Best Short-Term Strategy. The book praised CVS CEO Lany Merlo, pointing to him as an example of aCEO who adopted a long-term strategic approach.

172.    In a 2018 interview, Zemmel continued his praise of Merlo:

> When [Merlo] and his team made the decision to stop selling cigarettes, not only was the decision extremely well syndicated, extremely well thought through, extremely well managed from all the operational details.  But also, they did it at a time when the company was performing well.

173.    Zemmel, who was reportedly among the candidates to succeed Kevin Sneader as McKinsey's global managing partner, previously led the firm's health care practice and worked with several pharmaceutical clients. Today, Zemmel leads McKinsey Digital, a division of the firm that focuses on big data and analytics—which is likely connected to CVS's use of McKinsey's big data platform Periscope.

174.    Zemmel has also written articles with several McKinsey consultants whose work at the firm included advising opioid manufacturers as well as the FDA. In 2010, he co-authored a McKinsey article that examined drug failure rates in clinical trials. His co-authors on the article, entitled "Anatomy of Attrition," were Maria Gordian and Navjot Singh. As noted below, Gordian was a key adviser to Purdue Pharma and helped the manufacturer implement its risk evaluation and mitigation strategies and approval strategies for extended-release opioids. During the same period, Singh appears to have represented McKinsey in several of its engagements with the FDA.

175.    As shown by LinkedIn profiles, CVS and McKinsey are also connected by a

personnel pipeline.  McKinsey associate Diya Sikka joined the consultancy in 2017 from CVS Health; at CVS, she studied how legislation on opioid abuse would impact CVS pharmacies. In 2019, Sree Chaguturu, a former consultant with the McKinsey Hospital Institute, became the chief medical officer at CVS Health. The same year, a senior analytics manager at McKinsey named Taras Gorishnyy became vice president for enterprise retail analytics at CVS Health.

176.    At one point, McKinsey's advice to Purdue Pharma on how it could increase OxyContin sales involved offering CVS and other pharmacy companies a cash rebate for every overdose that was attributed to pills they sold. According to documents made public as part of litigation against Purdue, a 2017 McKinsey presentation included a slide depicting calculations of how many CVS customers would overdose in a year and the resulting revenue to CVS under the rebate plan. The slide illustrated that, if 2,484 CVS customers overdosed on the drug in 2019 or developed an opioid use disorder, and Purdue paid CVS $14,810 for each of those so-called events, then Purdue would pay the retailer $36.8 million that year.

177.    CVS took its own steps to boost opioid sales. The retailer sent letters to patients taking Opana, an opioid made by Endo—another McKinsey client—encouraging them to continue taking the drug. CVS also promoted opioids made by Actavis, another McKinsey client, using rebates and discounts to encourage sales of the drugs. CVS also worked with Purdue, another McKinsey client, to train the drugmaker's pharmacists to reassure patients and doctors who had concerns about the risks of OxyContin addiction and abuse.

178.    CVS is also part of a joint venture with Cardinal, another McKinsey client, that established Red Oak Sourcing, which is now one of the largest buyers of generic drugs in the country. Under the 2014 arrangement, Cardinal—one of the top opioid distributors—would make quarterly payments to CVS of $25.6 million, with additional payments if certain benchmarks were met.  As noted in the Ohio complaint, such a partnership created a direct financial tie between a distributor and a retailer that "invested them in each other's success."

//

179.    One of the top executives at Red Oak, Sumit Jain, previously worked at McKinsey. Jain, Red Oak's director of prescription sourcing, worked with pharmaceutical clients while at the

consultancy in the early 2000s, joining CVS Health in 2004.

**b)   McKinsey and Walmart**

180.    Wal-Mart Stores, Inc. ("Walmart") is a Delaware business entity with its principal place of business in Arkansas. At all relevant times, Walmart has distributed substantial amounts of prescription opioids in Arizona, where the Tribe is located.

181.    With more than 5,000 pharmacies in the United States, Walmart has played an enormous role in driving the opioid crisis. It sold more than 7 billion opioid pills from 2006 to 2014, behind only Walgreens and CVS.

182.    Walmart pharmacies in various states took actions that exacerbated the epidemic. It built incentive programs around the number of prescriptions filled by each pharmacy, which discouraged pharmacists from scrutinizing prescriptions with red flags. Consequently, as demonstrated in extensive litigation stemming from Walmart's role in the crisis, Walmart employees regularly filled prescriptions that were more frequent and larger than a typical painkiller recipient would need. The chain also made a practice of filling opioid prescriptions for out-of-town customers, often combined with other drugs that were abused in tandem with opioids.

183.    McKinsey has worked for Walmart since at least 2004, when the consulting firm compiled a report about how negative press affected consumers' willingness to shop at Walmart. Two years later, McKinsey consulted on Walmart's health care programs. In 2007, McKinsey advised Walmart on the composition of its workforce and its reliance on an aged employee base.

184.    McKinsey's publications have frequently highlighted Walmart's executives and initiatives, a practice that typically involves the firm's clients. For instance, a pair of 2019 reports on retail practices discussed Walmart extensively. And, in September 2018, McKinsey's website published an interview Kathleen McLaughlin, the retailer's chief sustainability officer. These repeated promotions of Walmart in McKinsey publications suggest that the client relationship began in the mid-2000s, if not sooner, and has persisted until very recently.

//

185.    At least two top figures at Walmart also have professional ties to McKinsey. McLaughlin, the chief sustainability officer mentioned above, spent 23 years at McKinsey prior to

joining the retail giant. Walmart board member Timothy Flynn is also on the board of MIO Partners, McKinsey's internal hedge fund.

### 4. McKinsey Worked with Several Investment Funds, Including its Own Hedge Fund, with Extensive Investments in the Opioid Industry

186.    McKinsey and its internal hedge fund, MIO, also have extensive ties to TPG Group and Deerfield Management, which have held significant stakes in leading opioid manufacturers like Par Pharmaceutical and addiction treatment facilities like American Addiction Centers. Both TPG and Deerfield have longstanding connections to McKinsey and MIO Partners. Deerfield manages more than $100 million on behalf of MIO and has been one of the firm's top managers for close to a decade. A TPG executive who previously worked at McKinsey was recently named a trustee of an MIO sub-unit that controls close to $8 billion and TPG is reportedly a client of McKinsey. As is the case for many McKinsey clients, many McKinsey employees worked for TPG or Deerfield before or after they worked at McKinsey.

187.    SEC filings list more than 60 funds that serve as MIO's third-party managers. Through this group, MIO has held stakes in virtually every key manufacturer that is publicly traded. At least one of these funds was executing trades at the explicit instruction of MIO, according to government filings. This pattern of trading meant that the personal financial interests of McKinsey consultants were aligned with those of opioid manufacturers and distributors. In sum, McKinsey profited from every aspect of the opioid crisis that it helped create and maintain, including through consulting fees, government contracts, and investments in every business category, from manufacturing to addiction rehabilitation centers.

//

### C. MCKINSEY ACTED AS A COORDINATOR TO THE OPIOID INDUSTRY IN ORDER TO TURBOCHARGE ITS SALES AND DEFEAT EFFECTIVE REGULATION

### 1. McKinsey Created Aggressive Marketing Strategies Targeting High Volume Prescribers in Order to Turbocharge Sales of Opioids

188.    McKinsey used its world class expertise to create and execute aggressive marketing schemes for various opioids manufacturers as well as distributors and retailers in the opioids industry. These marketing schemes proved to be wildly successful for McKinsey's clients but

devastated the lives of hundreds of thousands of people.

189.    In the early days of the opioid crisis, McKinsey pushed an aggressive and strikingly similar sales strategy for several of its opioid manufacturer clients. This strategy, which McKinsey personnel have referred to as "turbocharging" opioid sales, pushed McKinsey clients to seek out vulnerable patient populations and create incentives for doctors who prescribed to them.

190.    For example, one presentation to Johnson & Johnson advised the drugmaker to "target high abuse-risk patients (e.g., males under 40)."

191.    Such strategies meant that the success of McKinsey clients was purposefully linked to greater rates of addiction.

192.    Another example is McKinsey's suggested tactic of "patient pushback," where McKinsey and manufacturers encouraged patients to lobby their doctors for opioids when those physicians expressed reservations regarding the administration of opioids.

193.    The key prong of McKinsey's advice, however, was to identify historically large prescribers and target ever more sales and marketing resources on them. For example, McKinsey devised a "physician segmentation" initiative whereby it analyzed the opioid prescribing patterns of individual physicians to identify those who had historically been the highest volume prescribers. McKinsey identified these physicians as optimal targets for a massive marketing push to sell more opioid products.

194.    McKinsey then worked with certain of its opioid manufacturer client's sales and marketing staff to target those prescribers specifically with a marketing blitz to encourage even further prescribing. Manufacturers trained their sales forces in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

195.    McKinsey helped shape opioid marketing, which misleadingly centered on freedom and peace of mind for users. One advertisement said, "we sell hope in a bottle," even though both McKinsey and the manufacturers already understood the addiction problems associated with opioid use and abuse. McKinsey encouraged manufacturers to tell doctors that certain opioid products would give their patients "the best possible chance to live a full and active life."

196.    McKinsey eventually unveiled "Project Turbocharge" to one of its clients, stating that

the most prolific prescribers wrote twenty-five times more prescriptions than less prolific prescribers. In developing Project Turbocharge, McKinsey conducted significant market research, including ride-alongs with sales representatives to learn how they promoted opioid products. McKinsey carefully monitored its client's sales representatives and provided guidance on prescriber messaging and adhering to target prescriber lists.

197.    Project Turbocharge had the following key components:

a)    focus sales calls on high-volume opioid prescribers, including those that wrote as many as twenty-five times as many opioid prescriptions as their lower volume counterparts;

b)    remove sales representative discretion in targeting prescribers;

c)    focus the marketing messaging to titrate to higher, more lucrative dosages;

d)    significantly increase the number of sales visits to high-volume prescribers; and,

e)    create an alternative model for how patients receive opioid products, including direct distribution to patients and pharmacies, to help address the "product access" problem.

198.    Based on its market research, McKinsey understood that the higher the dosage strength for any individual prescription, the greater the profitability for its clients. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised its clients to focus on selling higher strength dosages of opioids.

199.    McKinsey's work on increasing individual prescription dose strength continued throughout the time McKinsey worked with its clients. McKinsey also recommended the use of quotas and bonus payments to motivate its client's sales force to sell as many prescriptions as possible.

200.    McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely based on prescription deciles to considering additional factors.

201.    Physician targeting proved effective. McKinsey advised its clients that visiting high-

1  prescribing doctors many times per year increased sales.

2      202.    In addition to its work with Purdue, McKinsey has performed "opioid-related work"

3  for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a

4  McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson &

5  Johnson aggressively target and influence doctors treating back pain to increase opioid sales.

6      203.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that

7  time, McKinsey had access to public information indicating that OxyContin and other opioids pose

8  significant risk of addiction and misuse.

9      204.    McKinsey's presentations to Purdue in 2013 included extensive discussion of

10 doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the

11 dangers of opioids. Rather than working to limit the dangerous effects of opioids, however,

12 McKinsey treated doctors' misgivings as obstacles to overcome with new messaging.

13     205.    On October 23, 2017, the President of the United States declared the nationwide

14 opioid epidemic a "public health emergency." Nevertheless, McKinsey continued to propose

15 solutions to its clients to further boost opioid sales.  These solutions were touted by McKinsey as

16 "high impact interventions to rapidly address market access challenges."

17     206.    McKinsey continued working with Purdue long after the severity of the opioid crisis

18 was well known.  In 2017, McKinsey proposed that Purdue pay CVS and other distributors of

19 OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

20     207.    A former McKinsey consultant described McKinsey's work with the opioid

21 manufacturers as "the banality of evil, M.B.A. edition. . . . They knew what was going on. And they

22 found a way to look past it, through it, around it, so as to answer the only questions they cared about:

23 how to make the client money, and when the walls closed in, how to protect themselves."

24     208.    In October of 2020, Purdue once again reached an agreement (the "2020 Settlement

25 Agreement") to enter a guilty plea related to its marketing of OxyContin.  The agreement includes

26 $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

27     209.    In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health

28 agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive

marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis thathas ravaged America for decades."

210.    This plea agreement concerned conduct from 2010 to 2018, directly implicating McKinsey in the conspiracy.

211.    The 2020 Settlement Agreement explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes" and includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

212.    On December 5, 2020, McKinsey issued the following statement  regarding its work with Purdue:

> December 5, 2020-As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong.   That said, we recognize that we have a responsibility to consider the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

213.    As shown above, McKinsey's work for opioid manufacturers extended beyond Purdue. McKinsey collected millions of dollars designing and implementing marketing programs for the country's largest opioid manufacturers, including Johnson & Johnson and Endo.  It designed and implemented marketing plans like those it created forPurdue.

214.    McKinsey has settled opioid-related claims with 50 states, the District of Columbia, and five U.S. territories.

### 2.    McKinsey Coordinated the Industry War Against the FDA's REMS

#### a)    McKinsey Worked for the FDA and Industry at the Same Time

215.    In 2007, Congress passed the Food and Drug Administration Amendments Act

("FDAAA"), which placed new restrictions on the use of prescription drugs judged to be high risk, including opioids. The FDAAA directed the FDA to require manufacturers of certain drugs to create new standards to mitigate the risk, which were called Risk Evaluation and Mitigation Strategies ("REMS"). The FDA had wide leeway to require new steps to be taken by providers and patients.

216.    After the FDA announced that it was developing new REMS standards for opioid makers in 2008, the agency initially sought to impose harsh new restrictions, such as added certifications for providers to a database of all providers who prescribed opioids.

217.    Since 2008, McKinsey has performed dozens of engagements on behalf of the FDA, earning more than $140 million from the agency. This is sufficient to make the FDA McKinsey's second largest source of federal revenue, after only the Department of Defense. McKinsey has worked particularly with the Center of Drug Evaluation and Research ("CDER"), the FDA unit that has primary responsibility for approving new drugs-including opioids-and ensuring their safety.

218.    CDER has paid McKinsey more than $44 million in connection with 17 contracts since 2009, with much of its work focused on streamlining the drug approval process. During the same period, the agency has made a series of policy decisions that helped spur the opioid industry's fortunes. These included measures that eased restrictions on the entire industry, as well as approvals targeting specific drugs or companies. In many cases, CDER's decisions had a direct and positive financial impact on McKinsey clients.

219.    For instance, in 2012, the FDA approved REMS for opioid makers that had been significantly watered down from the strict standards that had been initially proposed. McKinsey was working with CDER throughout this period and its contracts from the time suggest that it may have had a role in helping CDER define REMS standards. At the same time, McKinsey was separately working with an industry group to lobby the FDA against strict new REMS standards.

220.    Similarly, throughout the past decade, McKinsey has performed multiple contracts that focused on accelerating CDER's process for approving new drugs, including opioids. With this revamped approval process in place, CDER has issued approvals of multiple opioid products marketed by McKinsey clients like Purdue Pharma and Endo International.

221.    McKinsey also helped the FDA build a monitoring system called "track and trace,"

which was intended to secure the supply of drug distribution. This new system had the potential to add a significant burden to drug distributors, including McKinsey clients like McKesson and Cardinal Health. As part of its work with the agency, McKinsey was directed to liaise with stakeholders in the supply chain, a euphemism that likely refers to distributors—including its own clients. The system that McKinsey helped design was subsequently judged a significant failure.

222.    While McKinsey was advising it, the FDA has taken these and other missteps that have contributed to a worsening opioids climate. For instance, in 2012, the year in which the new REMS were announced, fewer than 25,000 people died of opioid-linked overdoses in the United States. That figure rose steadily over the next several years, with nearly 50,000 Americans dying of opioid-involved overdoses in 2019.

### b)    McKinsey Advises the Industry to "Band Together" Against the FDA at the Same Time it is Advising the FDA

223.    As noted above, CDER played a key role in establishing the opioid REMS, or additional safeguards for new drugs, that were announced in 2012 after nearly four years of consideration.

224.    In November 2007, following its first criminal conviction stemming from its role fueling opioid addiction, Purdue formally solicited the FDA's approval of reformulated OxyContin tablets.

225.    In October 2008, the FDA advised Purdue Pharma that it had rejected Purdue's application. It also advised Purdue that it would be required to submit a REMS proposal for the reformulated OxyContin before the FDA would reconsider. The FDA encouraged Purdue to propose new restrictions on OxyContin's sale and promotions, including a new brand name. The FDA also said it would require Purdue to develop a framework that would limit OxyContin to pharmacies and providers that had received special training.

226.    In essence, the FDA letter promised a significant new regulatory burden targeting only OxyContin, the crown jewel of the business. The FDA's initial response suggested that only OxyContin would be subjected to this added burden, disadvantaging the painkiller in a crowded field.

227.    Internal Purdue communications, submitted as exhibits in subsequent litigation,

shows that the company's management saw the FDA's proposed course of action as a significant threat to the company.  Jonathan Sackler and Peter Boer, two members of the company's board, told Purdue's chief medical officer that reversing the FDA's opposition would "save the business."

228.    McKinsey consultants working for Purdue helped to formulate the company's response to the letter, recommending a strategy that would result in the approval of reformulated OxyContin and ensure that Purdue was not subject to unique REMS standards.

229.    Within hours of the FDA's issuance of the rejection letter, a Purdue executive shared it with McKinsey partner named Rob Rosiello. Another McKinsey partner working on the Purdue account, Maria Gordian, also saw the FDA letter almost immediately after its receipt. Purdue executives' communications with McKinsey consultants expressed the company's concern about the FDA's plans; one executive wrote to Rosiello that there was "[l]ots of palpable concern over FDA threat to Oxy."

230.    Within a week of receiving rejection letter, McKinsey had developed the outline of the strategy that Purdue would ultimately pursue. On October 16, 2008, a McKinsey partner named Loren Griffith told his colleagues that Purdue should "'band together' with other pharmacos doing C2 [Schedule II] opioids to jointly strategize how to deal with the FDA."

231.    Griffith's recommendation, first circulated among his McKinsey colleagues, was subsequently included in a formal presentation to Purdue management,  which suggested that the company "band together" and "work with others facing potential FDA action."  The presentation also recommended that Purdue work on deploying "arguments to defend against strict treatment by the FDA" and suggesting "FDA impropriety."

232.    In one section of the presentation, entitled "Recommendations on actions to take immediately," McKinsey suggested placing Craig Landau, Purdue's chief medical officer, in charge of the firm's response to the FDA. It further called on Purdue to engage Pinney Associates, a boutique firm that helps pharma clients deal with regulatory threats—especially those from the FDA. As part of its plan, McKinsey suggested that it work with Purdue's senior management to oversee the project.

233.    The basic strategic goal of McKinsey's "band together" proposal—an objective that

came up repeatedly in internal company communications—was to ensure that Purdue and OxyContin not be singled out by the FDA as a target for new REMS.

234.    McKinsey's proposal appears to have been accepted completely.  The "band together" strategy was to become a unifying principal of Purdue's-and, ultimately, the entire industry's dealings with the FDA in the years to come, leading up to the approval of new REMS in 2012.

235.    After Purdue accepted McKinsey's recommendations, McKinsey continued to loom large in Purdue's communications on the issue, suggesting that it was tasked with implementing the strategy it had designed. On October 23, 2008, approximately two weeks after the company received the rejection letter, McKinsey's Gordian emailed her colleagues Rob Rosiello and Martin Elling about Purdue's preparations:

236.    "[We had] Craig [Landau]  up for 2 hour working  session  with our FDA expert. . . . it was extremely helpful to get insights on how they  are crafting  the response. . . . I only had a chance to touch with John [Stewart] briefly. He is aware of the critical role we are playing in pulling REMS together and is very appreciative."

237.    Company records and other sources also reflect McKinsey's key role as the process unfolded. For instance, Marianna Sackler, the daughter of former company Chairman Richard Sackler, served as the "crisis project coordinator" for an internal group called  the "REMS  Core Team." In a recent deposition,  she disclosed  working  closely with several McKinsey consultants to develop Purdue's approach to the REMS process.

238.    As noted above, throughout this period, McKinsey was working for the FDA as well as Purdue and other opioid manufacturers. In 2009, the firm began working directly with CDER, the primary office tasked with creating the REMS standards. At least one contract from August 2011, involving CDER' s Office of Surveillance and Epidemiology, suggests that McKinsey may have worked on the agency's consideration of the new REMS.

239.    Purdue's internal communications indicate that company officials sought to leverage McKinsey's access and influence at the FDA. For instance, a November 2008 email from Purdue CEO John Stewart, in which he endorsed McKinsey's proposed band together strategy, suggested that McKinsey would be ideally suited to lead such an effort precisely because of its FDA work:

> Yes, I agree that it is reasonable to work towards bringing the pharma companies into a dialogue about how a classic approach might work... Even the initial meeting is likely to be more productive if it is facilitated and led by a third party. Perhaps a consultant such as McKinsey who did similar work in the industry and FDA on some aspects of clinical trials or a healthcare-related group that would be interested in playing an active role in the program's development and delivery would be a good choice.

240.    On December 8, 2008, less than a month after Stewart sent the above message, the FDA advised Purdue that it was no longer seeking a REMS standard for OxyContin alone. Instead, the FDA planned to roll out REMS for the entire class of extended-release opioids.

241.    In essence, the first major step of McKinsey's band together strategy had been accomplished. In response, Richard Sackler sent an email to several Purdue executives: "This is very good news," he wrote. "It appears that we will be grouped with other opioids that are potentially abusable and there will be a class REMS."

242.    In February 2009, less than two months after the FDA's letter to Purdue rescinding its request for proposed REMS addressed only to OxyContin, the FDA had advised Purdue and 15 competitors that it was developing class-wide REMS for extended-release opioids.

243.    Over the next three and a half years, the FDA and the drugmakers affected by the opioid REMS engaged in a long negotiation about the final rules. The FDA initially proposed REMS that would have drastically restricted and heavily regulated opioid sales. McKinsey would play a key role in delaying and diluting those regulations. At the same time, Purdue and its competitors formed a collective bloc to push for loose standards—just as McKinsey had recommended—and engaged ostensibly independent actors to advocate on their behalf.

244.    The FDA initially discussed a raft of new restrictions, including mandatory certification for doctors and pharmacists that prescribed and supplied opioids and comprehensive databases of opioid prescriptions and providers. These proposed regulations could have severely curtailed the freedom with which drugmakers and providers could flood the market with opioids.

245.    In March 2009, following a meeting with the FDA, Purdue and 22 other manufacturers created a consortium known as the Industry Working Group ("IWG"), whose basic purpose was to avoid strict REMS on opioids. In essence, the IWG represented the fulfilment of McKinsey's strategy. The group's members included several McKinsey

clients, such as Endo, Mallinckrodt, and Janssen.

246.    There is significant evidence that McKinsey coordinated the IWG's work. As noted above, the mere existence of the IWG reflected McKinsey's strategic recommendations. Moreover, when the group ratified its charter in May 2009, it agreed to designate an unnamed "third-party vendor" to oversee its activities. Such a role is perfectly aligned with the recommendation that Purdue CEO John Steward laid out in the November 2008 email discussed above.

247.    The FDA held its first public meetings on the opioid REMS over two days in May 2009. The meeting, which was attended by Purdue's CMO Craig Landau and representatives of several IWG members, allowed the public to offer comment on the FDA's REMS proposal.

248.    As would become an increasingly common occurrence when government agencies considered restricting the availability of opioids, a multitude of so-called pain advocates spoke at the meeting, repeatedly warning FDA officials about the potential hmm of strict REMS standards. Many of these advocates appeared on behalf of groups that were either affiliated with or even directly funded by Purdue; they appear to have been part of a concerted effort to promote uncertainty about the wisdom of restrictive REMS.

249.    One such advocate was Mark Maginn, a representative of the Purdue-funded American Pain Foundation (APF). Maginn, who suffered from arthritis and fibromyalgia, warned FDA officials about being "sentenced to the savage gulag of hellish pain" if they imposed demanding REMS standards. At least four other speakers representing the APF echoed his sentiments. The APF also worked with another Purdue-funded group, the PainCare Forum (PCF), to coordinate the industry's response to the FDA's REMS consideration.

250.    Sidney Schnall, vice president for risk management at Pinney Associates, addressed FDA officials on the second day of the public meeting in May 2009. As noted above, one of McKinsey's initial recommendations in response to the OxyContin rejection was that Purdue retain Pinney, and that Pinney operate under McKinsey's direction. Like the fo1mation of the IWG, Schnoll's appearance at the meeting is therefore consistent with a scenario in which opposition to the

REMS was coordinated by McKinsey.

251.    Like the APF figures, Schnall also described numerous malign consequences should the FDA adopt strict opioid REMS, including higher prices and providers declining to submit to the increased bureaucratic demands and refusing to prescribe opioids altogether. Schnall also accused the FDA of neglecting to focus on the "demandside" of abuse, instead targeting only suppliers—that is, drugmakers like Purdue.

252.    On July 9, 2012, the FDA announced its final rules on the opioid REMS. Instead of the demanding standards that had been initially contemplated, the final REMS were largely optional and lacked any major reforms. In essence, the REMS amounted to little more than requiring drugmakers to fund voluntary safety courses for doctors and literature about the potential harm of opioids.

253.    In the end, the opioid REMS process contradicted the preferences of the FDA's own advisory panel (made up of industry veterans and academics). The panel voted by a margin of 25-10 against the FDA's proposed regulations, which, although nonbinding, would typically sink a proposed initiative. In this case, however, the FDA's decisionmakers ignored the panel's recommendations in favor of an outcome favorable to McKinsey's clients.

254.    Lobbying by the Pain Care Forum and other groups with deep ties to the industry reportedly played key role in the FDA's decision. PCF representatives reportedly met with FDA officials to discuss the issue in June 2012, one month prior to the final decision on REMS.

255.    In the aftermath of the FDA's REMS decision, the U.S. opioid epidemic grew even more deadly. From 2012 to 2017, the number of opioid-related fatal overdoses in the United States more than doubled, from 23,166 to 47,600.

256.    In addition to coordinating industry actions, McKinsey personnel also dealt with the firm's pharma clients while working on behalf of the FDA. Archived calendars show that Ted Fuhr, a McKinsey partner who participated extensively in the firm's FDA engagement, joined CDER boss Janet Woodcock in a 2010 meeting with Mylan, a generic opioid producer. Mylan was a member of the IWG, which sought concessions from Woodcock's agency during this period.

257.    After rebranding itself as the REMS Program Companies, the IWG continued

operation for at least four years after the conclusion of the REMS saga.  As late as 2016, it continued to deal with the FDA on issues related to the opioid REMS.

### c)    McKinsey and the "Track and Trace" FDA Program

258.    McKinsey also played a key role in implementing the FDA's system for monitoring prescription drugs, the "track and trace" system. After winning a $1.6 million contract in 2010, McKinsey spent parts of the next five years building the system to prevent counterfeit, adulterated, or expired drugs from entering the drug supply chain.

259.    While not initially focused primarily on opioids, policymakers called on FDA to make use of track and trace as a tool to combat illicit opioid use as the epidemic spread. For instance, Ohio Congressman Bob Latta urged the FDA in 2017 to use track and trace to address opioids that were being siphoned from the legal supply chain.

260.    The contracts with the FDA required McKinsey to liaise with "supply chain stakeholders," which likely includes drug distributors, while creating the system.

261.    As noted above, McKesson, Cardinal Health, and AmerisourceBergen—the three largest pharmaceutical distributors in the U.S.—have all repeatedly hired McKinsey in recent years. The system that McKinsey was building could therefore impose significant costs on its clients in the private sector. As a result of McKinsey's efforts, however, the regulations were diluted, and its clients avoided effective regulation.

262.    Track and trace would subsequently be criticized, particularly regarding the FDA's performance on opioids. According to these critics, the failures of track and trace limited the agency's ability to meaningfully combat opioid abuse and prevented it from correcting the big three distributors' lax approach to protecting their products. In 2019, as part of a detailed examination of the program, a publication called Orthopedics This Week reported that the system McKinsey built had been "massively outmaneuvered" by drug distributors.

263.    As the publication noted, between 2012 and 2017 the big three distributors—McKinsey clients Amerisource Bergen, McKesson, and Cardinal Health—shipped more than 1.6 billion doses of opioids to Missouri alone. In this case-and in many others like it-the shipments far outstripped the quantity of drugs needed for normal use.

264.    In 2019, the FDA issued a warning letter to McKesson for its failure to comply with the Drug Supply Chain Security Act, the legislation underlying the track and trace system. This was the first warning letter issued to any distributor pursuant to the law. The letter cited numerous occasions on which McKesson shipments of opioids appear to have been stolen, presumably to feed illegal consumption.

265.    Just as the weakened REMS allowed McKinsey's manufacturer clients to protect their revenues, the haplessness of track and trace allowed the big three distributors to book record profits on the back of the worsening opioid epidemic.

### 3.    McKinsey Coordinates the Approval of Reformulated OxyContin

266.    CDER continued to approve new opioid treatments even as the number of opioid-related deaths spiked through most of the 2000s. For example, the agency allowed Purdue to continue marketing OxyContin, even after its 2007 criminal conviction.

267.    As noted above, Purdue applied that year for approval of its reformulated OxyContin tablets, which it had redesigned to reduce their susceptibility to abuse. In October 2008, CDER rejected the application on the basis that the drug remained vulnerable to abuse. In addition to sparking the REMS "band together" strategy, this rejection prompted a separate lobbying campaign that McKinsey helped design and implement, ultimately resulting in the agency's approval of reformulated OxyContin in April 2010.

268.    McKinsey's role in helping Purdue navigate the FDA's demands appears to have been paramount. A January 2009 email from McKinsey partner Maria Gordian to her colleagues Rob Rosiello and Martin Elling indicates that the firm was playing a leading role in preparing Purdue for its interactions with the FDA, including by conducting mock sessions aiming to replicate meetings with agency officials:

> We had a very good FDA rehearsal yesterday with several family members present. The team did an outstanding job on the study. Preparing the client and executing the mock meeting. We are off to DC today for the actually (sic) FDA meeting tomorrow.

269.    The final sentence of Gordian's email suggests McKinsey consultants may have been physically present at the FDA meeting.

270.    Later that year, in September 2009, Purdue met publicly with the advisory committee

that was considering its application reformulated OxyContin. At the meeting, Purdue made the case that its new formula for OxyContin would be sufficient to deter abuse. According to the properties of the PowerPoint presentation that Purdue used at the meeting, which remains available online, the document was prepared by Brian Grandfield, a senior graphic designer at McKinsey.

271.     Edward Cone is an in vitro testing consultant with Pinney Associates. Previously, Cone joined a January 2009 Purdue meeting with the FDA, which was referenced in Maria Gordian's emails. Cone told officials that his in vitro testing of reformulated OxyContin indicated that the opioid would be less prone to abuse because of the difficulty in crushing or snorting the tablets.

272.     Cone also told officials that he had been retained by Purdue in October 2008. As described above, McKinsey had recommended that same month that Purdue retain Pinney and employ McKinsey to coordinate its work in response to the FDA's rejection of OxyContin. This suggests that McKinsey was responsible for Cone's and Pinney's efforts in convincing the FDA to allow reformulated OxyContin to proceed.

273.     The group's efforts on behalf of Purdue were successful. On April 5, 2010, seven months after the public meeting, the FDA announced its approval of reformulated OxyContin. In announcing the decision, Bob Rappaport, CDER's director of the Division of Anesthesia and Analgesia Products, conceded that the new drug was merely an "incremental" improvement, but nonetheless concluded "it is still a step in the right direction."

274.     Contradicting the logic set forward by Rappaport, subsequent reviews of the decision indicate that the altered formula for OxyContin did little to stem the flood of opioid overdoses. In 2020, two FDA advisory committees evaluating the impact of the reformulated drug—the Drug Safety and Risk Management and Anesthetic and Analgesic Drug Products—concluded overwhelmingly that the new form of OxyContin did not substantially reduce overall harm of the opioid epidemic.

### a)     McKinsey Coordinates FDA Drug Approvals to Help Turbocharge Opioid Sales

275.     CDER's approval of several other opioid drugs in the years after it permitted

reformulated OxyContin to hit the market further contributed to the growing crisis.

276.    In December 2011, CDER approved a reformulated version of Opana ER, a popular opioid owned by McKinsey client Endo International. Less than six years later, the FDA compelled Endo to pull Opana from the market because of its propensity for abuse and overdose.

277.    In February 2015, CDER approved a reformulated version of Zohydro, an extremely powerful hydrocodone painkiller, even though an FDA advisory council had previously voted 11-2 against the drug's approval. Because of both the drug's potency and its lack of abuse-deterrent features, the panel concluded that its users would be at high risk of overdose.

278.    In August 2015, CDER approved Purdue's application for OxyContin promotions aimed at children as young as 11 years old.

279.    In November 2018, CDER approved Dsuvia, an under-the-tongue tablet opioid that is 10 times stronger than fentanyl. The chairman of an advisory panel that reviewed the drug warned that it could be easily diverted and abused, and critics of the decision noted that another key FDA advisory group, the Drug Safety and Risk Management Advisory Committee, was excluded from the approval process.

280.    These decisions all occurred while McKinsey was playing a leading role in helping the FDA streamline its approval process. The collective impact of McKinsey's work in this realm exacerbated the opioid epidemic. A September 2020 study by researchers at the Johns Hopkins Bloomberg School of Public Health found several significant shortcomings in FDA's approval process for prescription opioids over the past two decades.

281.    According to the Johns Hopkins study, 48 new opioid applications were approved between 1997 and 2018. During this period, opioid-linked overdoses spiked from roughly 8,000 to more than 47,000. The Johns Hopkins researchers concluded that drugs ostensibly intended to treat of chronic pain had been approved despite that fact that no trials lasted longer than three months, meaning it was impossible to have an accurate picture of their long-term effects. Furthermore, the vast majority of the clinical trials of these painkillers excluded patients who could not tolerate the drug under review, which "stacks the deck in favor of finding a medicine safe and effective."

**4.    McKinsey Coordinates with Woodcock on Behalf of the Industry**

282.     McKinsey's role in the opioid epidemic stems from its relationship with Janet Woodcock, a top FDA official. As the longtime head of CDER, Woodcock has faced criticism for the FDA's missteps on opioid regulation. During her tenure, McKinsey's work both for the FDA in general and CDER in particularly expanded dramatically.

283.     Woodcock was named CDER director in 1994. After three years in other senior FDA roles in the mid-2000s, she returned to head CDER in 2007, where she remained for 13 years. She left CDER in 2020 to work on the FDA's effort to develop therapeutics to fight the COVID-19 pandemic, before being named the interim head of the FDA in January 2021.

284.     Woodcock's division has been the source of more than $40 million in contracts for McKinsey since 2009, as described above. The close relationship between the firm and Woodcock and CDER was the subject of a 2010 Wall Street Journal report on the expanded influence of consultants at the FDA. The article focused on Woodcock's hiring of McKinsey to help CDER reduce a backlog of generic drug applications.

285.     Woodcock has relied on McKinsey to help craft the agency's policies on key issues affecting the industry. In essence, this places McKinsey in the conflicted position of helping determine government policy on issues affecting the vital interests of its private clients.

286.     For instance, as noted above, an online calendar indicates that McKinsey partner Ted Fuhr accompanied Woodcock during a May 2010 meeting with Michael Houghton, an executive from drugmaker Mylan, and a few other pharma experts. That meeting, which involved a CDER unit called the Office of New Drug Quality Assessment, likely concerned opioids. Houghton's primary focus at Mylan was opioids and he helped design company's fentanyl transdermal patch. Moreover, Mylan was part of the IWG that was then lobbying the agency with regard to its proposed REMS standards—an effort headed by McKinsey. Thus, it appears that a McKinsey consultant was advising Woodcock in her dealings with one of the firm's pharma sector allies—if not an outright client.

287.     Indeed, Woodcock seems to have collaborated with Fuhr on multiple initiatives over many years. In 2009, Fuhr published a white paper on quality by design (QbD) principles, a specialized approach to drug development through which the FDA sought to accelerate its drug approvals. That same year, CDER hired McKinsey to help implement QbD within the agency. And

in June 2010, one month after the Mylan meeting attended by both Fuhr and Woodcock, Fuhr participated in a panel discussion about QbD alongside three other CDER officials.

288.    In July 2014, Fuhr published a study on QbD, whose forward was written by Woodcock. The document, titled "Flawless: From Measuring Failure to Building Quality Robustness in Pharma," has been widely quoted and referenced by other senior FDA officials in subsequent presentations and seminars.

### 5.    McKinsey Coordinates FieldGuide Software to Turbocharge Sales

289.    According to court filings, McKinsey worked with Purdue to develop a software program called FieldGuide, which was ultimately aimed at boosting opioid sales. McKinsey has claimed that FieldGuide uses "geospatial analysis" to ensure that pharma salespeople are deployed as efficiently as possible.

290.    After working with Purdue to refine the product, McKinsey also sought to license FieldGuide to other opioid manufacturers, allowing them to also "target and aggressively pursue high-volume prescribers." McKinsey convinced at least one leading opioid retailer, CVS, to use a related service called Periscope.

### 6.    McKinsey Coordinated Front Groups to Protect Opioid Sales and Resist Effective Regulation

291.    Based on McKinsey's advice, many pharma clients have used front groups to push the public debate toward positions favorable to pharma companies.

292.    For instance, acting on the advice of its consultants at McKinsey, Purdue deployed patient education programs to create more public acceptance of opioid use and counteract growing resistance to their prescription. Purdue and McKinsey built their efforts around a group called Partners Against Pain, which provided information to doctors and consumers that downplayed the risk of opioid addiction. While, in fact, it was funded by Purdue and acted at the company's direction, Partners Against Pain maintained the fiction of being an organic "alliance of patients, caregivers, and health care providers."

293.    Several other opioid manufacturers, often working in tandem, have also funded ostensibly unbiased professional and patient advocacy groups to make their case. According to court

filings, these include McKinsey clients Actavis, Endo, Mallinckrodt and Teva, all of which directed and funded a collection of pro-opioid groups analogous to Partners Against Pain. These front groups took various actions that advanced the interests of drugmakers, ranging from responding to negative press to lobbying against tightened regulations.

294.    One of these other groups was American Pain Foundation, which received more than $10 million in funding from opioid manufacturers from 2007 to May 2012, when it closed. As discussed above, the group helped amplify the industry's response to the FDA's opioid REMS proposals.

### 7.    McKinsey Coordinated Key Opinion Leaders

295.    McKinsey has consistently encouraged its clients to use "key opinion leaders" (KOLs), such as doctors and purported pain experts who were paid by the manufacturers to promote their pro-opioid message, to make their case.

296.    The evidence of McKinsey's use of KOLs dates to at least 2008, when a McKinsey publication stressed the importance of KOLs to an effective marketing strategy for pharmaceutical products.

297.    Court filings show that McKinsey recommended that Purdue use KOLs as part of a broader strategy to "continue pushing opioids on high-volume prescribers." McKinsey's advice resulted in Purdue's undisclosed cultivation of dozens of KOLs, who distorted the public debate about opioids via misleading white papers and studies arguing that the drugs safe and effective.

298.    Litigation targeting manufacturers far beyond Purdue has uncovered evidence that many others were also deploying KOLs, which suggests that McKinsey's advice became standard practice. One well known KOL was Russell Portenoy, who "was instrumental in opening the door for the regular use of opioids to treat chronic pain." Portenoy received consulting fees, honoraria, and research funding from several McKinsey clients, including Teva, Endo and Purdue.  Another prominent example is Lynn Webster, the author of several continuing medical education programs sponsored by Teva, Endo and Purdue.

### D.    MCKINSEY'S EFFORTS TO TURBOCHARGE OPIOID SALES RESULTED IN DECEPTIVE MARKETING AND DIVERSION

299.    Each opioid manufacturer has a duty under Arizona law to exercise reasonable care in

marketing and selling opioids.

300.    Opioid manufacturers also have a common law duty to make a full and fair disclosure as to the matters about which they choose to speak.

301.    McKinsey directed, advised, encouraged, instigated, promoted, aided and abetted its opioid manufacturer clients to breach their duty of reasonable care in the marketing and selling of opioids.

302.    McKinsey's clients breached their duties by making statements through websites, promotional materials, conferences, guidelines for doctors, and other vehicles suggesting that the risk of addiction when opioids are used for chronic pain was low—statements directly contrary to established scientific evidence.

303.    McKinsey's clients utilized various channels to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids, including (1) front groups that were organized or supported by McKinsey's clients but appeared to be independent and (2) so-called KOLs. The front groups put out patient education materials and treatment guidelines that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks. McKinsey's clients funded these front groups at McKinsey's direction to ensure supportive messages from these seemingly neutral and credible third parties; that funding did, in fact, ensure such supportive messages—often at the expense of their own constituencies. The American Pain Foundation, the American Academy of Pain Medication, the American Pain Society, the Federation of State Medical Boards, the Alliance for Patient Access, the U.S. Pain Foundation, and the American Geriatrics Society all functioned as front groups.

304.    McKinsey's clients produced and provided directly to doctors and patients marketing materials that made similar misstatements. Purdue issued marketing materials, starting in 1996, stating that "addiction to opioids legitimately used in the management of pain is very rare." Endo distributed a pamphlet, "Living with Someone with Chronic Pain," which stated that most health care providers agree that most people do not develop an addiction.

305.    McKinsey's clients ran websites that promoted similar misleading claims. For example, Endo sponsored painknowledge.com and painaction.com, which claimed, as of 2009 and

2015, respectively, that "[p]eople who take opioids as prescribed usually do not become addicted" and that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

306.    McKinsey's clients, with its assistance, trained salesmen to downplay the risk of addiction. For instance, Purdue salesmen were instructed to tell doctors that opioids' addiction risk was "less than one percent."[1]

307.    McKinsey's clients sponsored training sessions where doctors were given similar misleading information regarding the risks of opioid addiction. For example, Purdue sponsored training sessions in the late 1990s and early 2000s where opioid addiction was described as "exquisitely rare."[2]

308.    All these statements were false. The CDC has stated that: (1) there is "extensive evidence" of the possible harms of opioids, including addiction; (2) "[o]pioid pain medication use presents serious risks," including addiction; and (3) using opioids to treat chronic pain "substantially increases" the risk of addiction.[3] Studies have found that up to 26% of long-term users of opioids experience problems with addiction or dependence.[4]

309.    Moreover, in August 2016, the U.S. Surgeon General expressed concern that "heavy marketing to doctors" had led many to be "taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain" and noted the "devastating" results that followed from this misinformation.[5]

310.    Findings by the FDA similarly belie the marketing claims made by McKinsey's clients that opioids are safe for treating chronic pain. These findings show that: (1) "most opioid drugs have 'high potential for abuse'"; (2) treatment of chronic pain with opioids poses "known serious risks," including "addiction, abuse, and misuse . . . overdose and death," even when used "at recommended doses"; and (3) opioids should be used only "in patients for whom alternative

---

[1] U.S. Gov't Accountability Office, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (Dec. 2003), https://www.gao.gov/products/gao-04-110.
[2] Barry Meier, Pain Killer: A "Wonder" Drug's Trail of Addiction and Death 190 (2003).
[3] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016,* 65 Morbidity and Mortality Weekly Report 1 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[4] *Id.*
[5] Letter from U.S. Surgeon General Vivek H. Murthy (Aug. 2016).

treatment options" have failed.[6] Several studies finding double-digit rates of prescription drug abuse in chronic pain patients controvert Marketing Manufacturer Defendants' claims that addiction rates are less than one percent.[7]

311.    McKinsey's clients also made false statements that individuals showing signs of opioid addiction might instead have untreated pain requiring additional opioids—a baseless theory labeled "pseudoaddiction."

312.    Purdue published a physician education pamphlet in 2011 suggesting that drug-seeking behavior could be a sign of "pseudoaddiction," which was described as "[drug-seeking behaviors] in patients who have pain that has not been effectively treated." Purdue used the term "pseudoaddiction," a term coined by Dr. J. David Haddox, the Vice President of Health Policy for Purdue,8 in numerous other marketing materials, including one entitled "Responsible Opioid Prescribing – A Physician's Guide." Endo also published materials promoting the theory of "pseudoaddiction."

313.    There is, however, no scientific support for the concept of "pseudoaddiction." In fact, Endo's Vice President for Pharmacovigilance and Risk Management recently testified that he was not aware of any research validating the "'pseudoaddiction' concept."[8]

314.    The 2016 CDC Guideline rejects the notion of pseudoaddiction. Instead of recommending that opioid dosages be increased if patients do not obtain relief, the guideline states that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer term use" and that doctors should "reassess[] pain and function within 1 month" so as to "minimize risks of long-term opioid use."[9]

---

[6] Letter from Janet Woodcock, M.D., Dir. of FDA, Center for Drug Evaluation and Research, to Andrew Kolodny, M.D. Responding to Petition Submitted by Physicians for Responsible Opioid Prescribing (Sept. 10, 2013).

[7] Caleb J. Banta-Green et al., *Opioid Use Behaviors, Mental Health and Pain-Development of a Typology of Chronic Pain Patients*, 104 Drug and Alcohol Dependence 34 (Sept. 2009); Joseph A. Boscarino et al., *Risk Factors for Drug Dependence Among Out-Patients on Opioid Therapy in a Large US Health-Care System*, 105 Addiction 1776 (Oct. 2010); Jette Hojsted et al., *Classification and Identification of Opioid Addiction in Chronic Pain Patients,* 14 European J. Pain 1014 (Nov. 2010).

[8] Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 7, *In re Endo Health Solutions Inc.,* No. 15-228 (Attorney General of the State of N.Y. 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

[9] Deborah Dowell, Tamara Haegerich, & Roger Chou, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity and Mortality Weekly Report 1, 13 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

315.     McKinsey's clients also falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk.

316.     Guidelines edited and sponsored by Purdue and Endo and put out by front groups—namely "Treatment Options: A Guide for People Living with Pain" (2006) and "A Policymaker's Guide to Understanding Pain & Its Management" (2011)—claim that: (a) some patients "need" a larger opioid dosage, regardless of the dose prescribed; (b) opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain; and (c) dosage escalations, even unlimited ones, are "sometimes necessary."[10]

317.     As recently as June 2015, Purdue's "In the Face of Pain" website was promoting the notion that, if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, the patient should find another doctor who will. Also, in 2015, Purdue presented a paper on the Problems of Drug Dependence, challenging the correlation between opioid dosage and overdose.15 And in 2016, Purdue's Dr. Haddox falsely claimed that the evidence does not show that Purdue's opioids are being abused in large numbers.[11]  Dr. Haddox's false statements on behalf of Purdue are an example of active concealment of Purdue's wrongdoing with respect to causing the opioid epidemic.

318.     Endo distributed a pamphlet in 2004, "Understanding Your Pain: Taking Oral Opioid Analgesics," which stated that patients "won't 'run out' of pain relief" so long as they increase dosages. Endo also sponsored a website from 2004 to 2007, painknowledge.com, which claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain."

319.     McKinsey's clients made these statements despite strong contrary scientific evidence. The FDA has stated that the available data "suggest a relationship between increasing opioid dosages and risk of certain adverse events." The CDC has stated that there is "an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages," and has specifically recommended that doctors "avoid increasing doses" above 90 morphine milligram

---

[10] Am. Pain Found., *Treatment Options: A Guide for People Living with Pain* (2006).
[11] Harrison Jacobs, *There is a Big Problem with the Government's Plan to Stop the Drug-Overdose Epidemic,* Business Insider, Mar. 14, 2016 https://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3.

equivalents ("MME") per day.[12]

320.    Nonetheless, McKinsey's clients misrepresented the effects of escalating dosages to further their relentless pursuit of corporate profit. The ability to escalate dosages was critical to the manufacturers' efforts to market opioids for chronic pain treatment because doctors would otherwise abandon treatment when patients built up tolerance and no longer obtained pain relief. Indeed, for at least some products, escalation of dosage was key: of the seven available OxyContin tablet strengths, the three strongest-40 milligrams (120 MME), 60 milligrams (180 MME), and 80 milligrams (240 MME)-all exceed the CDC limit when taken twice per day as directed. Thus, despite the overwhelming evidence that their marketing had irresponsibly caused the opioid epidemic, McKinsey's clients denied the link, both concealing and worsening their wrongful conduct and its adverse effects.

### E.   MCKINSEY HAS PROFITED FROM EVERY ASPECT OF THE OPIOID CRISIS

321.    While McKinsey's consultants helped opioid manufacturers and distributors boost demand for their products, the firm stood to profit from the sale of those deadly drugs. McKinsey's internal hedge fund, MIO Partners, has invested in funds with significant holdings in the top opioid manufacturers and distributors for more than a decade, giving the firm a large financial stake in the industry's success. At some points over that period, MIO's advisers have owned shares in these drug companies worth tens of millions of dollars.

322.    McKinsey's investment strategy relied on the firm's extensive ties with two of the biggest financial backers of the opioid industry, which have held major stakes in leading opioid manufacturers, drug distributors, and addiction recovery centers. This network of relationships enabled McKinsey and MIO to profit from investments across the opioid supply chain.

323.    With its financial stake in the opioid industry, McKinsey was a powerful force behind the deadly opioid crisis. At the same time, the investments allowed McKinsey's partners to draw additional profits from the opioid epidemic.

---

[12] Deborah Dowell, Tamara Haegerich, & Roger Chou, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity  and Mortality Weekly  Report 1, 13 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

### 1.    MIO's Opioid Investments

324.    For years, MIO Partners has held significant indirect investments in Mallinckrodt Pharmaceuticals. The Missouri-based company specializes in generic medicines and asserts that it is particularly adept at manufacturing-controlled substances, effectively allowing it to produce more opioids. It has also been named in several other lawsuits brought against the companies responsible for the opioid epidemic.

//

325.    MIO's network of money managers appears to have given the fund indirect stakes in Mallinckrodt during the past several years. For example, HealthCor Management held a stake in the company worth more than $150 million in the third quarter of 2017. Another MIO money manager, Magnetar Financial, disclosed in the fourth quarter of 2017 that it held 10,470 shares, with about $236,000. In total, MIO advisers have declared holdings in Mallinckrodt at least 17 times since the end of 2017.

326.    While MIO's advisers held significant stakes in Mallinckrodt, McKinsey itself had direct ties to the drugmaker. Frank Scholz, who has been a top Mallinckrodt executive since 2014, spent nearly 20 years with McKinsey's pharma practice in Chicago and Hamburg, Germany, before joining the drug company. At Mallinckrodt, Scholz's first post was senior vice president of global operations.

327.    MIO's investment advisers have also traded regularly in Teva Pharmaceuticals over the past decade. The American Israeli drug company has been a leading target of lawsuits aimed at authors of the epidemic. Teva has been sued by more than 2,500 counties and municipalities related to its opioid manufacturing.

328.    MIO has had an indirect, but nearly continuous, stake in Teva since 2015. Over that period, 11 separate MIO adviser funds have held investments in the company. For example, in the first quarter of 2015, HealthCor Management held shares in the company with more than $115 million. One of MIO's advisers, Visium Asset Management, has said that MIO instructed it to buy some of its shares in Teva.

329.    The ties between McKinsey and Teva stretch beyond the MIO investments. In 2012, Teva hired the consulting firm to oversee a reform of its management. There are personnel overlaps

between the two companies as well, with several former McKinsey employees holding key positions at Teva. Kare Schultz, who has been the CEO of Teva since 2017, worked at McKinsey earlier in his career. Schultz has also held leadership roles at several other drug companies that also used McKinsey consultants. Roger Abravanel, a member of the Teva board from 2007 to 2017, took on that role after a lengthy consulting career at McKinsey.

//

330.    MIO has also had significant indirect holdings in Endo International. The Pennsylvania-based company has played a major role in the opioid epidemic. For several years during the 2010s, opioid sales accounted for the bulk of Endo's U.S. revenues. In 2017, the FDA ordered Endo to remove its best-selling opioid, Opana ER, from the market because of its links to diseases like HIV and hepatitis. Today, the company faces several lawsuits from state attorneys general that have targeted opioid manufacturers.

331.    During the 2010s, six different MIO money managers held investments in Endo. Visium Asset Management held the largest stake, with holdings worth more than $360 million in the third quarter of 2015. During much of the time that Visium held shares in Endo, at least $3 million of its position was held by two funds that MIO controlled. In addition, several other MIO adviser funds held positions in Endo: Bogle Investment Management, Bridgewater Associates, Carlson Capital, First Quadrant, and Magnetar Financial.

332.    McKinsey has worked closely with Endo over the past decade. Endo's CEO during the mid-2010s was Rajiv De Silva, who had spent several years at McKinsey earlier in his career. Over the same period, the firm helped shape Endo's merger and acquisitions strategy, and McKinsey consultants appear to have worked on at least two corporate takeovers.

333.    Since 2015, several of MIO's investment advisers have held substantial stakes in McKesson Corporation. McKesson, the largest pharmaceutical distributor in the United States, has repeatedly been sanctioned for its role in the opioid epidemic. The company faced total penalties of more than $160 million in 2008 and 2017 for failing to protect the supply chain and report unusually large orders of opioids.

334.    At least 11 of MIO's third-party adviser funds have declared stakes in McKesson

since 2015. According to the funds' quarterly 13F filings with the SEC, MIO has held a stake in McKesson for that entire five-year period, except for parts of 2016 and 2017. Visium Asset Management, which reached a stake worth $117 million in the third quarter of 2015, appears to have acquired some portion of its holdings at McKinsey's explicit direction.

335. As noted above, McKinsey has executed engagements for McKesson, and the two films are linked by significant personnel flows. Marc Owen, who led McKesson Specialty Health during the early 2010s, worked at McKinsey for more than a decade earlier in his career. At McKinsey, Owen founded the film's Business Technology Office. In addition, McKesson is frequently mentioned in McKinsey publications, which is often an indication of an ongoing client relationship.

336. MIO also holds an indirect stake in Cardinal Health, another McKinsey client and also a leading distributor of opioids in the United States. Thousands of opioid lawsuits have been filed against Cardinal Health by county and municipal governments.

337. Since 2015, 11 of MIO's third-party advisers have declared stakes in Cardinal Health. Most of the holdings are in line with the positions that Bridgewater Associates held during 2018 and 2019, which were worth $20-$30 million. In 13F filings with the SEC covering the second quarter of 2020, at least four MIO advisers declared holdings in Cardinal Health: Alambic Investment Management, First Quadrant, M&R Capital Management, and Bridgewater.

338. Cardinal Health is among McKinsey's long list of clients and a number of top executives have worked for both firms. Nancy Killefer, who joined Cardinal Health's board in 2015, was previously the head of McKinsey's public sector practice. Michelle Holcomb, who became Cardinal Health's executive vice president and head of strategy in 2017, worked in the health care practice at McKinsey from 1995 to 2010.

339. MIO's investment advisers have also maintained stakes in Emergent BioSolutions in recent years. Emergent makes many products, the best known of which may be Narcan, a nasal spray form of naloxone that is used to prevent overdoses. With this holding, MIO's advisers have profited from investments across the opioid industry, from companies that cause overdoses and to those that treat them.

340.    Since 2015, three of MIO's third-party advisers have repeatedly declared holdings in Emergent: Bogle Investment Management, First Quadrant, and SIO Capital. The three funds have not held Emergent continuously, but Bogle said it held more than $1 million with of Emergent shares through at least the end of the second quarter of 2020.

341.    As is the case with many of MIO's investments in the pharmaceutical sector, McKinsey appears to have wielded influence at Emergent. Shazad Malik, a doctor who worked for McKinsey's Pharmaceutical practice for two years, was a director at Emergent during the mid-2000s.

342.    Two MIO funds have held a significant stake in Adamis Pharmaceuticals for the past several years. The California-based company is developing an injectable form of naloxone. The anti-overdose product, with the brand name Zimhi, is awaiting FDA approval.

343.    The pair of MIO funds, Compass MAY LLC and Compass Offshore MAV Limited, acquired their Adamis stake in 2015 or earlier. An Adamis filing with the SEC that year listed the two MIO funds-in addition to several funds belonging to SIO Capital, a longtime MIO Partners investment adviser-as the beneficial owners of 9.9% of the company's common stock and all of its preferred shares. According to the same filing, SIO Capital managed the Compass investment on MIO's behalf, in addition to its own holdings in Adamis.

344.    SIO Capital Management, which often discloses that its investments were made on behalf of MIO Partners, first acquired an 11% stake in Adamis in October 2014. Since 2015, when the MIO funds first appeared on Adamis's SEC filings, the company has continued to list MIO among its largest shareholders.

345.    There are also direct personal ties between McKinsey and Adamis. One of the company's co-founders in 2005 was Rand Mulford, a former McKinsey consultant.

### 2.    McKinsey and Deerfield

346.    Over the past decade, MIO Partners has placed a large portion of its money with Deerfield Management Company. With MIO's backing, the $10 billion investment firm has invested in leading opioid producers and distributors. Deerfield, which focuses on health care and biotechnology, has also invested in two leading chains of addiction treatment centers.

347.    MIO Partners made its first investment in funds run by Deerfield in 2010 and its holding has increased steadily in the decade since, according to MIO filings with the U.S. Department of Labor. MIO maintained a total of about $40 million in three Deerfield funds at the end of 2010. That increased to a total of nearly $60 million in two Deerfield funds by 2013. In 2019, the most recent year for which data is available, MIO Partners said it had a total of more than $108 million in two Deerfield-run funds.

348.    Deerfield has invested hundreds of millions of dollars in two large chains of addiction treatment facilities, American Addiction Centers ("AAC") and Recovery Centers of America ("RCA"). Both AAC and RCA have been accused of prioritizing their bottom line over patient care.

349.    Deerfield built up a stake of more than 5% of AAC in 2015, after which it loaned the Tennessee-based chain $100 million to pursue expansion plans and buy new clinics. Critics have reported that the chain relies on high-pressure marketing and delivers poor care. In California in February 2018, a jury awarded $7 million to the family of a man who died by suicide at one of AAC's facilities. Deerfield Management sold its AAC holding in early 2019 and AAC filed for bankruptcy in June 2020.

350.    At about the same time that Deerfield made its investment in AAC, it also took a significant stake in RCA. Deerfield announced in December 2015 that it was making a $231.5 million investment in RCA.  The funds were intended for eight treatment campuses in the Northeast of the United States that were to provide about 1,200 beds. Deerfield invested another $100 million in RCA less than a year later, in November 2016, for the construction of at least four more treatment centers.

351.    RCA grew quickly, backed by investments from Deerfield and others and, as the opioid epidemic spread destruction across the country, its facilities garnered attention for their gardens and fine art. Despite the heavy spending on RCA's facilities and marketing, however, the chain, like AAC, appeared to falter when it came to patient care. In 2017, STAT and the Boston Globe reported that patients, who paid an average of $24,000 a month, were often left unsupervised and that some in RCA's care did not receive even basic counselling. State inspectors said that, at one RCA facility in Massachusetts, "worker training was lacking, the facility was understaffed." One

employee said the lack of supervision made the center like a "drug hotel and brothel."

352.    Even after the highly critical report in 2017, Labor Department filings show that MIO continued to hold $100 million in investments with Deerfield the following year. At the same time, McKinsey produced research that helped boost interest in addiction treatment services like those offered by RCA. A 2018 McKinsey study suggesting that opioid addiction rates in the United States were under reported prompted a flurry of investment in treatment centers to meet what was expected to be increasing demand for those services. The McKinsey study likely increased the value of Deerfield's stake in the treatment sector, and, with that, the value of McKinsey's investments with Deerfield.

353.    The ties between Deerfield and RCA that stretched beyond those investments. Deerfield' s managing director, Alex Kamal, is a member of RCA's board. Kamal is also working with the founder of RCA on a $1.1 billion cell and gene therapy manufacturing center.

354.    At the same tie that Deerfield was making significant investments in addiction treatment facilities, it held large stakes in several major opioid producers and distributors. SEC filings show that Deerfield has traded in Mallinckrodt Pharmaceuticals stock since 2014. For a period in 2017 and 2018, Deerfield owned more than 6% of Mallinckrodt, making it one of the company's biggest shareholders. The most recent available filings show that Deerfield retained a stake in Mallinckrodt through at least the second quarter of 2020.

355.    In addition to Mallinckrodt, Deerfield has held substantial stakes in two other opioid manufacturers that are defendants in ongoing national litigation. In 2013 and 2014, Deerfield had significant holdings in Allergan in 2013, and, from 2011 through 2016, it had a major stake in opioid manufacturer Teva.

356.    Deerfield has also invested in companies that distributed opioids, including McKesson and Cardinal Health. Deerfield's earliest stake in McKesson, the largest drug distributor in the United States, dates to 2011. In the second quarter of 2020, its McKesson holding was valued at more than $40 million. During several periods between 2003 and 2006, Deerfield also reported holding shares in Cardinal Health. As described above, both Cardinal Health and McKesson face ongoing litigation stemming from their part in the opioid crisis.

357.    Deerfield has also made major investments in several films that are working to develop new applications for opioid medicines.

358.    Deerfield has a substantial stake in Mylan N.V., which manufactures generic morphine and fentanyl. Mylan is also involved in several anti-overdose medications. Other films that have been backed by Deerfield include KemPharm Inc., a small opioid manufacturer working on an anti-overdose medication, and Flamel/Avadel, a French company that manufactures a tamper-free opioid distribution device called Trigger Lock.

359.    Deerfield's portfolio also includes investments in several companies that manufacture some of the leading anti-addiction medications. Deerfield was among the original investors in Alkermes, the company that makes Vivitrol. The drug, which was approved by the FDA in 2010 for use in opioid addiction cases, interferes with opioid receptors in the brain and reduces the drugs' addictive qualities.

360.    During the same period, Deerfield made substantial investments in Titan Pharmaceuticals and Braeburn Pharmaceuticals. The two companies were then working together to develop probuphine, which was marketed as a competitor to Vivitrol. Probuphine uses an under-the-skin implant that slowly releases anti-addiction medication.

361.    Taken together, Deerfield-with support from MIO Partners-has invested vast amounts in a full range of enterprises that might draw profits from the pain faced by opioid abusers. Deerfield has invested hundreds of millions of dollars in the leading opioid makers and distributors in the country, while also taking substantial stakes in addiction treatment facilities and firms working to make overdoses less deadly.

362.    McKinsey also has an extensive partnership with TPG, a private equity firm with $80 billion in assets under management that has taken an active, but little-noticed, role in backing some of the key players in the opioid industry. McKinsey's relationship with TPG provides another avenue through which the consulting firm has contributed to the opioid epidemic.

363.    TPG has acquired large stakes in some of the country's biggest opioid producers. The Dallas-based firm, formerly Texas Pacific Group, is also reportedly a McKinsey client. TPG and MIO Partners have often taken stakes in the same companies, often involving firms that McKinsey is

also advising.

364.    There are also significant personnel overlaps between McKinsey and TPG. TPG has frequently hired former McKinsey consultants for top posts-particularly in its health care division, which typically made the fund's investments in opioid manufacturers. In addition, in 2019, a former McKinsey partner named Jerome Vascellaro, who was then TPG's chief strategy officer, became a trustee of the McKinsey Master Retirement Plan (MMRT), which invests retirement funds of McKinsey's non-partners.

## F.   MCKINSEY ENGAGES IN A CONSPIRACY WITH OPIOID MANUFACTURERS TO TURBOCHARGE IMPROPER SALES OF OPIOIDS

### 1.    The Common Purpose and Scheme of the Opioid Marketing Conspiracy

365.    Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which participated in the marketing and sale of opioids as described in this complaint, and manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Conspiracy Members") engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

366.    To unlawfully increase the demand for opioids, the Opioid Marketing Conspiracy Members formed an association-in-fact Conspiracy (the "Opioid Marketing Conspiracy"). Through their personal relationships, the members of the Opioid Marketing Conspiracy had the opportunity to form and take actions in furtherance of the Opioid Marketing Conspiracy's common purpose. The Opioid Marketing Conspiracy Members' substantial financial contribution to the Opioid Marketing Conspiracy, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

367.    The Opioid Marketing Conspiracy Members, through the Opioid Marketing Conspiracy, concealed the true risks and dangers of opioids from the medical community and the public, including the Tribe, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading

statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of "pseudoaddiction," a condition invented by the Opioid Marketing Conspiracy Members; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

368.    The scheme devised, implemented, and conducted by the Opioid Marketing Conspiracy Members was a common course of conduct designed to ensure that the Opioid Marketing Conspiracy Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Conspiracy Members' drugs. The Opioid Marketing Conspiracy Members acted together for a common purpose and perpetuated the Opioid Marketing Conspiracy's scheme, including through the unbranded promotion and marketing network as described above.

369.    There was regular communication between the Opioid Marketing Conspiracy Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Conspiracy Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Conspiracy's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

370.    As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Conspiracy, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Conspiracy for financial gain.

371.    The Opioid Marketing Conspiracy Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Conspiracy. The Opioid

Marketing Conspiracy's conduct in furtherance of the common purpose of the Opioid Marketing Conspiracy involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain.

372.    The impact of the Opioid Marketing Conspiracy's scheme can still be felt—i.e., opioids continue to be prescribed and used for chronic pain throughout the area of the Tribe and the epidemic continues to injure the Tribe and consume the Tribe's resources.

373.    As a result, the Opioid Marketing Conspiracy Members, including McKinsey, were each a willing participant in the Opioid Marketing Conspiracy, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Conspiracy's purpose.

### 2.    The Conduct of the Opioid Marketing Conspiracy

374.    From at least 2004 to the present, each of the Opioid Marketing Conspiracy Members exerted control over the Opioid Marketing Conspiracy and participated in the operation or management of the affairs of the Opioid Marketing Conspiracy, directly or indirectly, in the following ways:

a)   Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied uponby physicians, patients, and payors;

b)   Creating and providing a body of deceptive, misleading  and unsupported electronic and print adve1iisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii)  was thus more likely to be relied  upon by physicians, patients, and payors;

c)   Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and

payors;

d) Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

e) Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f) Using front groups and KOLs to mislead the public about opioids.

375.    The scheme devised and implemented by the Opioid Marketing Conspiracy Members amounted to a common course of conduct intended to increase the Opioid Marketing Conspiracy Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

## IV.    MCKINSEY'S MISCONDUCT HAS INJURED AND CONTINUES TO INJURE THE TRIBE AND ITS CITIZENS

376.    McKinsey and its co-conspirators had the ability and the duty to prevent misleading marketing and prescription opioid diversion, both of which presented known or foreseeable dangers of serious injury. Their failure to do so resulted in substantial injury to the Tribe and its citizens.

377.    The marketing campaigns of McKinsey and its co-conspirators have resulted in a significant increase in both name-brand and generic prescription opioid usage: between 1999 and 2016 the number of opioids prescribed nationwide quadrupled. Nationally, the number of people who take prescription opioids for non-medical purposes is now greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

378.    Every year, millions of Americans abuse opioid pain relievers, leading to addiction, overdose, and death. Data from the Substance Abuse and Mental Health Services Administration suggest that, in 2016, among Americans over the age of twelve, more than 1.75 million were prescription opioid-dependent and more than 11.5 million used prescription opioids for non-medical purposes.

379.     This growth in non-medical demand, addiction, and diversion has led to serious harm to the Tribe and its citizens. The increase in opioid usage has led to levels of addiction that, according to the U.S. Surgeon General, have "devastated" communities across America. Princeton University economist Alan Krueger found that opioids may be responsible for roughly 20% of the national decline in workforce participation by prime-age men and 25% of the drop by women. In 2011, the CDC reported that overdose deaths from prescription opioids had reached "epidemic levels." That year, 16,917 people in the United States died from a prescription opioid-related overdose. Since then, the national death toll has continued to rise. In 2014, 18,893 people died from a prescription opioid related overdose. In 2015, that number increased again to 22,598. As discussed above, overdose deaths in the United States involving prescription opioids have quadrupled since 1999. CDC data show that more than 123,095 people died from prescription opioid overdoses from 2011-2016.

380.     Every year, millions of people in the United States now misuse and abuse opioid pain relievers, potentially leading to addiction, overdose, and death. The overdose rate among American Indians, including White Mountain Apache citizens, is significantly higher than that for the rest of the population.

381.     American Indians, including the Tribe, have been significantly impacted by this epidemic. In general, American Indians suffer the highest per capita rate of opioid overdoses and are more likely than other racial/ethnic groups in the United States to die from drug-induced deaths.[13] Hundreds of American Indians have died of opioid overdoses in recent years and, for every opioid overdose death, it is estimated that there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 non-medical users of opioids.[14]

382.     American Indians have high rates of prescription pain reliever misuse. It is estimated

[13] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/pre-publications/Opioid_Brief.pdf.

[14] Jennifer DuPuis, *The Opioid Crisis in Indian Country,* at 37, https://www.nihb.org/docs/06162016/0pioid%20Crisis%20Paii%20in%20Indian%20Country.pdf (last visited Feb. 5, 2018); Gery P. Guy, Jr. et al., *Emergency Department Visits Involving OpioidOverdoses, U.S., 2010-2014,* 54 Am. J. of Preventive Medicine (Jan. 2018), http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext.

that 5.8% of the total American Indian population suffers from such misuse, including 42,000 abusing prescription Hydrocodone, 34,000 abusing prescription Oxycodone, and 1,000 abusing prescription Fentanyl.[15]

383.    The impact on American Indian children is particularly devastating. The CDC has reported that approximately one out of every 14.5 American Indian youths aged 12 or older used prescription opioids for non-medical purposes in 2012. This is 60% higher than the rate for white youths. Similarly, it has been reported that by twelfth grade, nearly 13% of American Indian teens have used OxyContin, an opioid manufactured by conspiracy member Purdue.[16] The fact that American Indian teens are easily able to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created an illegal secondary market for opioids.

384.    The opioid epidemic resulting from McKinsey and its co-conspirators' conduct has injured even the youngest members of Indian tribes. In 1992, in the United States, only 2% of pregnant women admitted for drug treatment services abused opioids. By 2012, opioids accounted for 38% of all drug treatment admissions of pregnant women.[17] Many tribal women have become addicted to prescription opioids and have used these drugs during their pregnancies. As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome, which can have adverse short- and long-term developmental consequences.

385.    Pregnant American Indian women are up to 8.7 times more likely than pregnant women from other groups to be diagnosed with opioid dependency or abuse and, in some communities, more than one in 10 pregnant American Indian women have a diagnosis of opioid dependency or abuse.

//

386.    Prescription opioid diversion on and around the Tribe contributes to a range of social

---

[15] Substance Abuse and Mental Health Services Admin., U.S. Dept. of Health and Human Services, *2018 National Survey on Drug Use and Health: American Indians and Alaska Natives(AI/Ans),* p. 13.

[16] Linda R. Stanley, *Rates of Substance Use of American Indian Students in 8th, 10th, and 12th Grades Living on or Near Reservations: Update, 2009-2012,* Pub. Health Rep. (Mar.-Apr. 2014), https://www.ncbi.nlm.nih.gov/pmc/artic1es/PMC3904895/table/Tl/.

[17] Naana Afua Jumah, Rural, Pregnant, and Opioid Dependent: A Systematic Review, l0 Substance Abuse 35 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/.25; Jean Y. Ko et al., CDC Grand Rounds: Public Health Strategies to Prevent Neonatal Abstinence Syndrome, 66 Morbidity and Mortality Weekly Report 242 (Mar. 10, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf.

problems. Adverse impacts on the Tribe's families include child abuse and neglect and family dysfunction. Tribe children are regularly removed from their families because of prescription opioid dependency and abuse by both children and parents. These removals harm the Tribe children and families as well as the Tribe itself, particularly when children are placed with families outside the Tribe.

387.    Other social problems caused by the opioid epidemic include criminal behavior, poverty, property damage, unemployment, and social despair. As a result of these adverse social outcomes, more and more Tribe resources are devoted to addiction related problems, leaving a diminished pool of resources available for education, cultural preservation, and social programs. Meanwhile, the opioid crisis diminishes the Tribe's available workforce, decreases productivity, increases poverty, and consequently requires greater expenditures for governmental assistance.

388.    It was reasonably foreseeable to McKinsey and its co-conspirators that their deceptive, unfair, false, and reckless marketing of opioids on and around the Tribe:

(1) would allow opioids to fall into the hands of addicts and other inappropriate users,

(2) would cause injuries, including abuse, addiction, overdoses, and death, and

(3) inflict these injuries on the Tribe and impose costs arising from these injuries on the Tribe.

389.    McKinsey and its co-conspirators knew or should have known that their continuing efforts to employ deceptive, unfair, and false marketing, despite being previously sanctioned by government agencies for such actions, would contribute to the opioid epidemic affecting the Tribe.
//

390.    McKinsey and its co-conspirators knew or should have known that a substantial amount of the opioids dispensed on and around the Tribe were being dispensed because of their deceptive, unfair, and false marketing. It was foreseeable that the increased number of prescriptions for opioids resulting from McKinsey and its co-conspirators deceptive, unfair, and false marketing would cause harm to individual pharmacy customers, third parties, and the Tribe.

391.    McKinsey and its co-conspirators made substantial profits over the years based on the deceptive, unfair, and false marketing of opioids on and around the Tribe. Their participation and cooperation in a common enterprise has foreseeably caused damages to the Tribe and injuries to its

citizens. McKinsey and its co-conspirators knew or should have known that the Tribe would be unjustly forced to bear the costs of these injuries and damages.

392.    McKinsey and its co-conspirators deceptive, unfair, and false marketing of prescription opioids to the Tribe showed a reckless disregard for the safety of the Tribe and its citizens. Their conduct poses a continuing threat to the health, safety, and welfare of the Tribe and its citizens.

393.    McKinsey's misleading marketing and failure to prevent prescription opioid diversion damaged the Tribe and its citizens. McKinsey's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, prope1iy damage, unemployment, and social despair. As a result, more and more of the Tribe's resources are devoted to addiction-related problems. Meanwhile, the opioid crisis diminishes the Tribe's available workforce, decreases productivity, increases poverty, and consequently requires greater expenditures by the Tribe.

## V.    TOLLING OF STATUTES OF LIMITATIONS

394.    McKinsey is equitably estopped from relying upon a statute of limitations defense. Alongside its clients, McKinsey undertook active efforts to deceive the Tribe and to purposefully conceal its unlawful conduct and fraudulently assure the public, including the Tribe, that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain and non-acute, non-cancer pain with the goal of increased sales, greater availability and access to opioids, and maximizing profits.

395.    McKinsey and its clients were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing of opioids. This deceptive marketing—which included the above falsehoods that opioids were safer, less subject to abuse, and less addictive than other pain medications—was a substantial factor in the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

396.    McKinsey deliberately advised its clients on marketing strategies and tactics to bolster their opioid products as non-addictive, safe, and efficacious without reliable scientific

evidence to support same. McKinsey's consulting services were given confidentially, and both McKinsey and its clients concealed the content of those services from the public. In doing so, McKinsey concealed its role in shaping, editing, and providing the content of the false and misleading materials addressing pain management and opioids that were widely disseminated to regulators, prescribers, and the public at large, including the Tribe.

397.    McKinsey also concealed from the Tribe the existence of the Tribe's claims by hiding it and its client's lack of cooperation with law enforcement. For example, in May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction and entered into a Corporate Integrity Agreement explained above. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

398.    Nevertheless, even after the guilty pleas, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations. Purdue also assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions—eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this Complaint. McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

399.    McKinsey affirmatively sought to convince the public that its clients' legal duties to

report suspicious sales of opioids had been satisfied through public assurances that they were working to curb the opioid epidemic. For example, after the 2007 Purdue guilty plea described above, McKinsey provided services to protect the company's public image and sales, aiding in the concealment of the addictive nature and dangers associated with opioid use and denying blame for the epidemic, attributing it instead solely to abuse and inappropriate prescribing. At the guidance and advice of McKinsey, Purdue and other McKinsey clients publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways, insisting they were good corporate citizens. Instead, McKinsey assisted Purdue, for example, with marketing campaigns and messaging that continued business as usual, indiscriminately targeting high prescribers and promoting opioids as safe but avoiding the pitfalls of the Corporate Integrity Agreement. These repeated misrepresentations misled regulators, prescribers, and the public, including the Tribe, and deprived the Tribe of actual or implied knowledge of facts sufficient to put the Tribe on notice of potential claims.

400.    The Tribe did not discover the nature, scope, and magnitude of McKinsey's misconduct, and its full impact on the Tribe, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

401.    Prior to the applicable limitations period, the Tribe did not suspect, and had no reason to suspect, that McKinsey's conduct caused their injuries, including the consumption of the Tribe's resources as the opioid epidemic remains unabated.

402.    McKinsey intended that its actions and omissions made with its clients would be relied upon, including by the Tribe. The Tribe did not know and did not have the means to know the truth due to McKinsey and its clients' actions and omissions.

403.    The Tribe reasonably relied on the affirmative statements developed by McKinsey and made by its clients regarding their purported compliance with their obligations under the law and consent orders, which were false and only intended to save the clients' public image.

404.    McKinsey's fraudulent concealment has tolled the running of any statute of limitations. Through it and its clients' affirmative misrepresentations and omissions, McKinsey

actively concealed from the Tribe the risks associated with opioids that led to the opioids crisis. The wrongdoing, misrepresentations, and omissions by McKinsey has not ceased because the public nuisance remains unabated.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) 18 U.S.C. § 1961, *ET SEQ.*

405.    The Tribe realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

406.    This claim is brought by the Tribe against McKinsey for actual damages, treble damages, and available injunctive and/or equitable relief under 18. U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*, specifically, 18 U.S.C. § 1962(c) and (d).

407.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." 18 U.S.C. § 1962(c).

408.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

409.    The Tribe is a "person," as the term is defined in 18 U.S.C. § 1961(3), and has standing to sue under 18 U.S.C. § 1964(c) as it was and is injured in its business and/or property "by reason of" the RICO Act violations described herein.

410.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

411.    McKinsey conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

412.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

413.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that,

although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

414. Opioid manufacturers, including Purdue, Johnson & Johnson, Janssen, Cephalon, Endo, and Mallinckrodt (collectively the "Opioid Manufacturers"), together with McKinsey, which participated in the marketing and sale of opioids as described in this Complaint, (collectively, the "Opioid Marketing Enterprise Members" or the "Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market and the market as a whole—through repeated and systematic misrepresentations, concealments, and omissions of material fact about the safety and efficacy of opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and practices, as described in the Factual Allegations section of this Complaint.

415. In order to unlawfully increase the demand for opioids and thereby increase their own profits despite their knowledge of the harmful effects that would follow, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise" or the "Enterprise"). The Opioids Manufacturers worked together to accomplish their aims, with McKinsey serving as a go-between that held all of the companies together and helped coordinate the deceptive marketing and sales strategies. Through McKinsey and their own personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying to prescribers and the Tribe in order to increase sales of addictive and dangerous drugs and line the enterprise members' pockets. The Opioid Marketing Enterprise Members' substantial financial contributions to the Opioid Marketing Enterprise and the advancement of opioids- friendly messaging fueled the U.S. opioid epidemic.

416. In the alternative, the association-in-fact Opioid Marketing Enterprise existed just between McKinsey and Purdue, who worked together to unlawfully increase sales of opioids— and grow Purdue's share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

McKinsey knew Purdue was marketing its opioids illegally and fueling an opioid epidemic, but using the knowledge it gained from its work with other opioid manufacturers, McKinsey joined forces with Purdue to turbocharge the opioids market in order to profit from this crisis.

417.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the Tribe and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

418.    The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Manufacturers' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

419.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

420.    The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the opioids continue to be prescribed and used for chronic pain throughout the United States, and the

epidemic continues to injure the Tribe and consume the resources of the Tribe.

421.    From at least 2004 to the present, each of the Opioid Marketing Enterprise Members played some part in directing the affairs of the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly.

422.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to enrich themselves by increasing sales of prescription opioids by convincing doctors to prescribe and patients to use opioids, including for long-term chronic pain, despite the Opioid Marketing Enterprise Members' knowledge of the addictions and deaths that would occur as a result. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

423.    The Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers and the Tribe by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding key opinion leaders ("KOLs") to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

424.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the internet to transmit communications and payments in interstate or foreign commerce.

425.    The Opioid Marketing Enterprise was more than a typical business relationship.

Rather, the members of the Enterprise knew that opioids were addictive and causing serious harm to people and communities but chose to work together to lie to prescribers and the Tribe about these drugs in order to increase their bottom lines. McKinsey worked closely with the Opioid Manufacturers to achieve these aims. McKinsey, as an advisor of multiple Opioid Manufacturers, also had access to information about multiple players and was able to coordinate the fraud occurring across the Enterprise. McKinsey was particularly embedded in Purdue's organizational structure and the relationship's longevity was sufficient to pursue the Enterprise's purposes. During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin.

426.    The operation of the Opioid Marketing Enterprise included several schemes to defraud that helped to further the goals of its members—i.e., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

427.    Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

428.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and the Plaintiff. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and the Tribe. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

429.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

430.    The Opioid Marketing Enterprise Members' violations of law and pattern of racketeering activity directly and proximately caused the Tribe injury in its business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic. The injuries of the Tribe, as described herein, were not unexpected, unforeseen, or independent. Rather, as the Tribe alleges, the Opioid Marketing Enterprise Members as a whole and McKinsey in particular knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA and knew that opioids were highly addictive and subject to abuse.

431.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose and the injuries that occurred as a result.

432.    But for the increase in prescribed opioids, the Tribe would not have to expend additional resources or suffered other harm to business and property as a result of harms associated with opioid addiction. The Enterprise persisted in targeting prescribers to prescribe high doses of opioids and knew that doing so would result in adverse health and social outcomes, including overdoses, neo-natal complications, harm to communities like the Tribe, hazardous waste in the Tribe's communities, as well as increased expenditures on services to combat such ill effects.

433.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged the Tribe. In addition to medical services, the Opioid Marketing Enterprise's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, the Tribe is devoting more and more resources to the opioid epidemic.

434.    Notably, the Tribe has experienced vast harm to Tribal business and property directly, proximately, and foreseeably caused by the racketeering enterprise. The full extent of the Tribe's damage cannot be fully captured in this pleading but can be fleshed out during the bellwether process. The injuries to the Tribe, as alleged throughout this Complaint, and expressly incorporated

herein by reference, include new, different, and increased expenditures by and losses to the Tribe, for example:

1.  Hazardous waste in the Tribe's communities, including on the Tribe's real property;

2.  Contamination of traditional food sources, which can cause economic harm to Tribal businesses such as commercial fishing;

3.  Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid- related addiction or disease, including overdoses and deaths;

4.  Costs of training first responders in the proper treatment of drug overdoses;

5.  Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

6.  Costs associated with emergency responses by first responders to opioid overdoses;

7.  Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

8.  Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mothers during pregnancy;

9.  Increased costs for Tribal health organizations in the form of increased expenditures on prescription opioids and their generic equivalents as a result of the Opioid Marketing Enterprise Members' misstatements and omissions;

10. Costs associated with the injuries to the health and welfare of the Tribal members and residents who reside in the Tribe's jurisdiction caused by the opioid epidemic;

11. Costs associated with providing care for children whose parents suffer from

opioid-related disability or incapacitation;

12. Costs associated with child protective services resulting from children being removed from their homes due to their parents' addiction to opioids;

13. Costs associated with increased need for judicial staff to address increased crime and child removal cases;

14. Burial costs associated with opioid-related deaths;

15. Diversion of profits from Tribally-owned business enterprises that could otherwise have been reinvested in those business enterprises or used to provide government services, loss of business revenue due to decreased productivity of Tribes' employees and adverse economic conditions created by the opioid epidemic, and loss of tax revenue;

16. Decrease in revenues in Tribally-owned businesses due to decreased employee productivity and adverse economic conditions that accompany the opioid epidemic, which have been created by the Opioid Marketing Enterprise Members' pattern of racketeering activity; and

17. Losses caused by the diversion of revenue to address the opioid epidemic that would otherwise have been used to provide other services.

435.    The injuries to the Tribe were directly and proximately caused by the Enterprise's racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to the Tribe. But for the opioid epidemic created by the Opioid Marketing Enterprise Members through their Opioid Marketing Enterprise, the Tribe would not have lost money or property, and the health and welfare of its citizens would not have been harmed.

436.    The Tribe has been injured by the Enterprise's conduct, and such injury would not have occurred but for the predicate acts which also constitute acts taken in furtherance of the conspiracy pursuant to Section 1962(d).

437.    The Tribe is a direct victim of McKinsey's misconduct. There are no intervening acts or parties that could interrupt the causal chain between McKinsey's mail and wire fraud and the Tribe's injuries. McKinsey, in furtherance of the Enterprise's common purpose, caused to be made

false and misleading statements directly to the doctors (who consumers rely on to provide health advice) and the public. Doctors are not a break in the causal chain. Instead, the Enterprise members as a whole, and McKinsey in particular, intentionally targeted doctors and sought to deceive them. That doctors were then deceived and behaved as the Enterprise wanted, prescribing more and more opioids, was the purpose of the scheme, not an intervening cause.

438.    The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to the Tribe, and the Tribe is entitled to bring this action for three times its actual damages, as well as for injunctive/equitable relief, costs and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## NEGLIGENCE AND NEGLIGENCE PER SE

439.    The Tribe realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

440.    "One who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as being as responsible as the one who commits that act so as to impose liability upon the former to the same extent as if he had performed the act himself."

441.    The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, the Tribe suffered damages as alleged herein.

//

442.    McKinsey, through its work with opioid manufacturers, owed the Tribe a duty to not expose the Tribe to an unreasonable risk of harm.

443.    McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to advising, consulting, and facilitating the marketing, selling and/or distributing opioids.

444.    McKinsey breached its duty to the Tribe by, inter alia, advising Purdue and other opioid manufacturers to implement sales and marketing strategies designed to increase sales of OxyContin.

445.    McKinsey breached its duty to the Tribe by working with opioid manufacturers to market opioids deceptively, including by downplaying the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

446.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Tribe described herein.

447.    McKinsey's failure to comply with its duties of care proximately caused damage to the Tribe.

448.    The negligence of McKinsey was a substantial factor in causing the Tribe's damages. But for McKinsey's services, Purdue and other opioid manufacturers would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration.

449.    As a further direct and proximate result of McKinsey's negligence, the Tribe suffered damages including, but not limited to, economic loss, business loss, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

450.    There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Tribe.

451.    Public policy supports finding a duty of care in this circumstance and a finding that McKinsey had a duty of care will deter McKinsey from engaging in such behavior in the future.

452.    Further, the conduct alleged against McKinsey in this Petition was despicable and subjected the Tribe to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including the Tribe and the Tribe's citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of the Tribe and its citizens. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Petition.

453.    The Tribe is without fault, and the injuries to the Tribe would not have occurred in

the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

454. The Tribe is entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

**COUNT III**
**CIVIL CONSPIRACY**

455. The Tribe realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

456. McKinsey, along with its co-conspirators Purdue Pharma, Johnson & Johnson, Endo, Mallinckrodt, Teva, Actavis, Abbott Labs, McKesson, AmerisourceBergen, Cardinal Health, CVS, Walmart, TPG Group, and Deerfield Management engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Petition. Their aggressive marketing campaign enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide, including throughout the Tribe's reservations and communities.

457. Without McKinsey's and its co-conspirators' misrepresentations, which created demand, they would not have been able to sell the increasing quantity of prescription opioids for non-medical or inappropriate purposes.

458. None of the opioid manufacturers or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

459. McKinsey and its co-conspirators agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. McKinsey and its co-conspirators performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating state law, and turning a blind eye to diversion of prescription opioids.

460. McKinsey and its co-conspirators agreed to violate the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, et. seq. McKinsey and its co-conspirators engaged in deceptive trade

practices including: making and causing to be made misrepresentations and omissions in marketing of opioids, that deceived or could reasonably be expected to deceive or mislead consumers.

461.    McKinsey and its co-conspirators engaged in unfair trade practices, including: intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medical necessity of opioids, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

462.    As a result of the concerted action between McKinsey and its co- conspirators, the Tribe and its citizens have suffered damages.

463.    McKinsey and its co-conspirators are jointly and severally liable for the sales and marketing practices used to promote OxyContin and other opioids.

## COUNT IV
## CIVIL AIDING AND ABETTING

464.    The Tribe incorporates by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

465.    McKinsey gave substantial assistance and encouragement to Purdue, the Sacklers, and other opioid supply chain clients regarding conduct McKinsey knew to be tortious and/or in violation of a duty owed by Purdue, the Sacklers, and other opioid supply chain clients to third persons, including to the Tribe.

466.    The Tribe was damaged as a result of the specific conduct thatMcKinsey encouraged and substantially assisted.

## COUNT V
## UNJUST ENRICHMENT

467.    The Tribe realleges and incorporates by reference the foregoing allegations as if fully set forth herein and further alleges as follows:

468.    As an expected and intended result of its conscious wrongdoing as set forth in this Petition, McKinsey has profited and benefited from the increase in the distribution and purchase of opioids within the Tribe's communities, including from opioids foreseeably and deliberately dive1ied within and into the Tribe's communities.

469.    The Tribe has expended substantial amounts of money to fix or mitigate the societal harms caused by McKinsey's conduct.

470.    The Tribe has conferred a benefit upon McKinsey by paying for what may be called McKinsey's externalities-the costs of the harm caused by McKinsey's negligent or otherwise unlawful distribution and sales practices.

471.    McKinsey is aware of this obvious benefit and that retention of this benefit is unjust.

472.    The Tribe has paid for the cost of McKinsey's externalities and McKinsey has benefitted from those payments because they allowed McKinsey to continue providing customers with a high volume of opioid products. Because of their deceptive marketing of prescription opioids, McKinsey obtained enrichment they would not otherwise have obtained. Because of their conscious failure to exercise due diligence in preventing diversion, McKinsey obtained enrichment it would not otherwise have obtained. The enrichment was without justification and the Tribe lacks a remedy provided by law.

473.    McKinsey made substantial profits while fueling the prescription drug epidemic in the Tribe's communities.

474.    McKinsey has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal, and unethical acts, omissions, and wrongdoing.

475.    It would be inequitable to allow McKinsey to retain benefit or financial advantage.

476.    McKinsey's misconduct alleged in this case has caused ongoing and persistent harm to the Tribe.

477.    The Tribe demands judgment against McKinsey for restitution, disgorgement, and any other relief allowed in law or equity.

**COUNT VI**
**FRAUD (ACTUAL AND CONSTRUCTIVE) AND DECEIT**

478.    The Tribe incorporates by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

479.    McKinsey made and caused to be made false representations to healthcare providers working in the Tribe's communities, and/or omitted material facts, regarding the risks, efficacy, and

medical necessity of opioids. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

      a.     Downplayed the substantial risks of addiction and other side effects of opioids, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

      b.     Overstated the efficacy of opioids, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

      c.     Misrepresented the medical usefulness and necessity of opioids generally, and Purdue's opioids specifically, including affirmatively marketing their drugs for off label uses (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare providers.

480.    These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein. McKinsey made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

481.    McKinsey, Purdue, and other opioid supply chain clients' misrepresentations and omissions had a tendency to deceive others, violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plans used by its opioid supply chain clients to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and to not disclose partial and misleading truths.

482.    McKinsey intended healthcare providers to rely upon its false assertions regarding the

risks, efficacy, and medical necessity of opioids generally, and Purdue's opioids specifically, to increase the number of opioid prescriptions made by healthcare providers.

483.    Healthcare providers working in the Tribe's communities did in fact rely on the false representations made in opioid marketing plans created by McKinsey and implemented with McKinsey's assistance.

484.    The Tribe seeks to recover all damages caused by McKinsey's fraudulent representations and omissions.

485.    McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others. As such, the Tribe seeks to recover punitive damages against McKinsey.

## VII.    PRAYER FOR RELIEF

WHEREFORE, The Tribe prays that the Court order McKinsey to pay compensatory and punitive damages, disgorgement as well as the Tribe's reasonable attorney's fees and costs for the bringing of this litigation.

## VIII.    REQUEST FOR JURY TRIAL

The White Mountain Apache Tribe respectfully requests that all issues presented by its above  Petition be tried by a jury, except for those issues that, by law, must be tried before the Court.

DATED: January 25, 2023

Respectfully Submitted,

_____
Richard W. Fields
Edward Han
Martin F. Cunniff
Fields Han Cunniff PLLC
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20007
(832) 382-9816
fields@fhcfirm.com
edhan@fhcfirm.com
martincunniff@fhcfirm.com

Karl Smith ("Butch") Bowers, Jr.

Bowers Law Office
1419 Pendleton St.
Columbia, SC 29201
(803) 753-1099
butch@butchbowers.com

Seneca Jacobs
501 Union St., 4th Floor
Nashville, TN 37219
senecajacobs@gmail.com


Attorneys for Plaintiff